McCartin v. Traphagen.

HENRY C. McCARTIN

v.

THE ADMINISTRATOR OF HENRY M. TRAPHAGEN, deceased, and others.

1. An heir-at-law is a proper, though not a necessary party to a suit against the legal representative of his ancestor, to recover loss sustained by a breach of trust of the ancestor as executor.

2. In a suit in equity against the legal representative of a decedent, a person who is made a defendant, but whose rights and interests are the same as those of the complainant, and who is a complainant in fact, though not in form, is not competent as a witness to give testimony as to transactions with the decedent or statements made by him.

McCartin *v.* Traphagen.

3. A complainant has a right to call a defendant, who is in fact an adverse party to him, as his witness.

4. Where two trustees have been guilty of a breach of trust, the court may determine the order in which they shall stand answerable for the loss, by making one primarily liable and the other secondarily.

5. Laches is a good defence in equity.

6. He who delays asserting his rights, until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure that it is impossible for the court to see whether what seems to be justice to him is not injustice to his adversary, has no right to relief.

On final hearing on bill, answers and proofs taken in open court.

*Mr. Gilbert Collins,* for the complainant.

*Mr. Henry M. T. Beekman* and *Mr. John N. Voorhees,* for the administrator of Henry M. Traphagen, deceased.

*Mr. A. Q. Garretson,* for Phœbe A. Watson.

*Mr. John Linn,* for William C. Traphagen.

VAN FLEET, V. C.

The complainant is the youngest child of Myles McCartin, deceased. Mr. McCartin died testate in November, 1859. He left a widow and five children. By his will he directed that the one-third part of his estate, both real and personal, should be set apart for the use of his widow during life, and that the *corpus* of this part of his estate, on her death, should be divided equally among his five children. The other two-thirds of his estate he gave to his five children, and directed that the share of each child should be made over as he or she attained to twenty-one years of age. He appointed his widow, Mary Ann McCartin, and Cornelius Van Vorst and Henry M. Traphagen the executors of his will. They all proved the will. Mr. Traphagen died intestate in May, 1884. This suit was brought in July, 1886. The persons made defendants are the surviving executrix and executor (Mrs. McCartin and Mr. Van Vorst), the adminis-

trator of Henry M. Traphagen, deceased, and also his heirs-at-law, namely, Phœbe A. Watson, William C. Traphagen and Henry Traphagen, and four of the testator's children, namely, Mary E. McCartin, Elizabeth C. McCartin, Isabella T. McCartin, and Myles F. McCartin. The suit has two objects: first, to procure a settlement of the estate of Myles McCartin, deceased, and a division of his property, under his will, among his beneficiaries; and second, to compel his surviving executrix and executor, and the legal representative of his deceased executor, to make good to his estate the losses which it is alleged the estate has sustained in consequence of misconduct by the executors.

Several questions, growing out of objections made to the suit in respect to parties, and also to the competency of witnesses, must be decided before the questions arising on the merits can be considered.

First, as to parties. It is objected that the heirs-at-law of Henry M. Traphagen, deceased, are not proper parties. No relief is sought against them, except it is prayed that they, together with the administrator of Henry M. Traphagen, deceased, and the two surviving executors, may be decreed to account for the execution of the trusts of the will of Myles McCartin, deceased, and also for the administration of his estate in this court, instead of rendering their accounts in the orphans court of the county of Hudson, where his will was admitted to probate. Heirs-at-law are answerable, to the extent of the value of the lands descended, for the debts of their ancestor, and also for damages arising from the breach of a covenant made by their ancestor. *New Jersey Ins. Co.* v. *Meeker, 8 Vr. 282.* And it is also well settled, that an action may be maintained against the legal representative of a decedent, whether he died testate or intestate, to recover damages arising from a violation of the decedent's legal duty, or a breach of trust. *Tichenor* v. *Hayes, 12 Vr. 193; Dodd* v. *Wilkinson, 14 Stew. Eq. 566.* And it would seem to follow, as a necessary deduction from the right of action thus established, that any claim which may be made the basis of a recovery against the legal representative of a decedent, will also be sufficient, as a ground of action, to support a recovery

against his heir-at-law. But I know of no rule of law which imposes upon an heir the duty of rendering accounts, for his ancestor, in courts exercising probate jurisdiction. It is obvious, that in the majority of cases, no such duty can rest upon him, for he is without the means of performing it. On the death of a trustee, where the subject of the trust is personalty, the trust property, as well as the books and papers relating to its administration, pass to his legal representative, and not to his heir-at-law. And so, too, where the subject of the trust is realty, the books and papers showing the administration of trust, pass, at least in the first instance, to the legal representative of the dead trustee, and not to his heir. I think, therefore, it is quite clear, that the duty which the complainant seeks to have imposed upon the heirs-at-law in this case, does not exist.

But the more important question is, Have not the heirs-at-law of Henry M. Traphagen, deceased, such an interest in the subject matter of this suit as renders them proper, though not necessary parties? The bill alleges, that Mr. Traphagen left a large amount of real and personal estate, which, to a considerable extent, has already been divided and distributed among his children. The proofs show, that $10,000 of his personal estate has been distributed to each of his children, and that a comparatively small amount remains in the hands of his administrator. Personal estate is the primary fund out of which the debts and liabilities of a decedent must be discharged. The rule is settled, that a legatee who has received his legacy is, always bound, at the instance of creditors, to refund his legacy, if there is a deficiency of assets to pay debts, whether the deficiency arises from an original want of assets, or the waste of the executor. This liability flows from the superior right of creditors, and does not at all rest upon contract. The legatee is liable, whether he has given a refunding bond or not. It is an obvious rule of justice, that neither a legatee, nor one of the next of kin, shall be entitled to anything, until the obligations and liabilities of the person through whom they derive their rights have been paid. *Lloyd* v. *Rowe, Spen. 684; 1 Story's Eq. Jur.* §§ *92, 503; Fonbl. Eq. book IV. pt. 1 ch. 2* § *5 note p; Lupton* v. *Lupton, 2*

McCartin *v.* Traphagen.

*Johns. Ch. 614.* While it is undoubtedly true, that no active relief can be given against the heirs-at-law, by the decree which may be made on this hearing, yet I think it is quite apparent that, if a decree should be made against the administrator of their ancestor, such decree might, in a subsequent proceeding, be made the proper foundation of relief against them. Even if they were not parties to this suit, I think they would be concluded by such decree, as to the amount for which their ancestor was liable, unless they could show that the decree was the product of fraud. Under this view, it is quite plain, that they have a vital interest in the result of this suit. There can be no doubt that they are proper parties under the rule adopted by Chancellor Zabriskie in *Dorsheimer* v. *Rorbuck, 8 C. E. Gr. 46.*

Second, as to the competency of certain witnesses. The complainant called his mother and his three sisters to testify to transactions with Henry M. Traphagen, deceased, and statements made by him. Their evidence, on these subjects, was objected to, and the question is, Were they competent to give the evidence objected to ? And first, as to the three Misses McCartin. Their position on the record is that of defendants, though their interest in the litigation is that of complainants. In respect to the whole subject matter of the litigation, they have the same interest exactly that their brother, the complainant, has. The only possible difference which exists between them is, that they are older than he is, and have consequently, if there has been laches, been guilty of greater laches than he has. In all other respects their positions are identical. This suit was brought as much for their benefit as it was for the benefit of the complainant. The bill so declares. It first alleges, that the executors have wasted the estate of their testator, and that the complainant and the other beneficiaries under the will, are, therefore, entitled to indemnity from the executors therefor, and then prays, that such indemnity may be decreed to them. There can be no doubt, that if the three Misses McCartin had taken their true position in the litigation, if they had placed themselves where their interests and their feelings place them, where they are, in everything except the barest form, they would have been incompetent to give the evidence

objected to. Though they are defendants in form, they are complainants in fact. If a decree goes in favor of the complainant, it must, *ex necessitate*, give the same measure of relief to each of these defendants that it does to the complainant, unless some special defence, peculiar to the defendants, and which exists against them alone, and not against the complainant, has been shown. The position of parties, having the same rights, in a suit of this kind, is a pure matter of arrangement, over which they have supreme control. The three Misses McCartin were necessary parties to this suit, but they were at liberty to choose their position ; they could be either complainants or defendants, just as they saw fit. I have no doubt that they were made defendants, not because they did not want the suit brought, nor because they were willing to appear as complainants, nor because it was supposed there was any conflict between their interests and those of the complainant, nor because it was suspected that they might desire to make defence against the complainants' action, but because it was thought possible, that, by making them defendants, they might be rendered competent to testify to declarations made by Mr. Traphagen, and thus increase their chances, and those of their brother, of being able to fasten a liability on Mr. Traphagen's estate.

The decision of the question under consideration must, of course, be controlled by the statute of 1880. *Rev. Sup. p. 287 § 1.* The main design of that statute is, so far as it prescribes a rule of exclusion, to prevent a person who seeks, by judicial action, to fasten a claim on the estate of a decedent, from putting in proof, by his own mouth, in support of his claim, anything the decedent may have said or done tending to show that the claim is valid. The purposes which the legislature had in view in enacting the statute are, I think, quite apparent. They were, first, to guard against the injustice which might arise from a want of mutuality in the exercise of the right to testify ; and, second, to prevent the danger which would almost unavoidably arise from perjury, or the suppression of material facts, if the living party to a transaction, where one was dead, was allowed to testify as to what the deceased party had said or done, respecting the transaction, in a suit by or

McCartin *v*. Traphagen.

against his legal representative. The nominal position of the person, whose competency is challenged, as a party on the record in the particular suit, is, in my judgment, of no importance, but the test, in such cases, is, Does he stand in a position of antagonism to the estate of the intestate or testator represented in the suit or proceeding in which he is called as a witness, so that if he should testify upon the prohibited subjects, he would give his testimony under a temptation to forget what he should remember, or to commit perjury ? If he does, he is incompetent. This, I understand, to be the test which the court of errors and appeals adopted in *Smith* v. *Burnet, 8 Stew. Eq. 314.* There exceptions were filed to the account of an executor, alleging that he had not charged himself with the whole of the estate of his testator. The executor, on the trial of the exceptions, attempted to defeat the claim of the exceptants, by showing, by his own oath, that the testator, in his lifetime, had made a gift to him of the property with which the exceptants sought to have him charged. But the court held that he was incompetent to give such evidence, and this ruling was put distinctly on the ground, that although the executor appeared in the proceedings as the ostensible representative of the testator, yet that he was not so in fact, but that his real character was that of a hostile suitor, who was not trying to defend the estate, but to deplete it. The court, therefore, dealt with him not in his nominal, but in his real, character. And so, I think, the three Misses McCartin must be dealt with in this suit.

The competency of the Misses McCartin to give the evidence objected to is, however, attempted to be vindicated on another ground. After they gave that part of their evidence, which, it is insisted, they were incompetent to give, the administrator of Henry M. Traphagen, deceased, was called as a witness, in his own behalf, and gave evidence. This, it is contended, rendered the Misses McCartin competent to give the evidence objected to. And it is also insisted, that although they were not re-examined after they were thus rendered competent, yet the court should, in the control which it may exercise over such matters, either direct that the evidence which they have already given shall stand as

part of the proofs in the case, or otherwise order that they may be re-examined. The court undoubtedly has the power, if the Misses McCartin were rendered competent, by an act done by the party objecting to their evidence, subsequent to the time when he interposed his objection, to give them the benefit of the right which his act conferred. As was said by the court of errors and appeals, in a case where a similar question was presented for decision, "it is the province of the court so to control the conduct of a cause and regulate its practice that no unfair advantage is taken by either side in presenting the merits of the cause for decision." *Walker* v. *Hill, 7 C. E. Gr. 513.*

The argument in favor of the contention, that the Misses McCartin were rendered competent by the act of the administrator, is based on that provision of the statute concerning evidence, which declares, that if a party to a suit in a representative capacity is called as a witness in his own behalf, and admitted, the opposite party may, in like manner, be admitted as a witness. *Rev. p. 378 § 4.* This provision, in my opinion, was supplanted by the statute of 1880. The regulation in force upon this subject, prior to the passage of the statute of 1880, was this: where either of the parties to a civil suit, sued or was sued in a representative capacity, the opposite party was prohibited from calling himself as a witness, in his own behalf, unless his adversary called himself as a witness, in his own behalf, and was admitted; if he did, then the opposite party thereby became a competent witness in the cause, and could testify generally upon every subject upon which he could give legal evidence. By the statute of 1880 this restriction was removed, and an entirely new regulation established. By the new act any party to a civil suit is made competent as a witness, notwithstanding any party thereto may sue or be sued in a representative capacity. Both parties are given full capacity, the opposite party as well as the representative party. The representative party was competent before, but he could not avail himself of his capacity without conferring like capacity on his adversary. If he chose to remain silent, the opposite party must also remain silent. Now, however, the right of the opposite party to speak does not at all depend upon the will

McCartin v. Traphagen.

of the representative party.    He has a right now to speak, within a certain range, whether the representative party speaks or not. His competency now is in no respect to be measured or controlled by the will or conduct of his adversary.    His right to testify now stands wholly emancipated from the control of his adversary, and is just what the statute of 1880 gives him—no more and no less.    He is a witness with full capacity to testify upon every issue involved in the suit, except that he cannot give testimony as to any transaction with or statement made by any testator or intestate represented in the particular action.    There is no hint in the statute of 1880 that his capacity, to testify upon the prohibited subjects, is to be in the slightest degree enlarged, or otherwise affected, by the fact that his adversary offers himself as a witness in his own behalf, and is admitted.    It is plain that the two statutes are repugnant in a vital point.    Under the old, the opposite party could, in no event, be a witness in his own behalf, unless the representative party was first admitted; while under the new, he stands entirely free from the restriction imposed by the old, and may call himself, without regard to the course pursued by the representative party, and when on the stand may testify fully, except on certain subjects.

But it is said that, although a repugnancy exists, it is only partial and not complete, and that, inasmuch as the statute of 1880 contains no express repealer of any part of the prior statutes, the court must, if possible, give effect to so much of the previous statutes as does not stand in clear conflict with the latter.    Under this view, it is contended, that, notwithstanding the prohibitory words of the statute of 1880, it is the right of the opposite party, whenever the representative party goes upon the stand, to give testimony in respect to the matters, which, by that statute, it is declared he shall be incompetent to give.    This contention, it seems to me, has nothing whatever on which it can stand.    The two statutes, as I read them, stand in direct and irreconcilable conflict throughout.    If this were not so, the intention of the legislature that the last should supersede the first, is so conspicuous that the court is bound to declare the first as no longer in force.    When two acts are not in express terms repug-

nant, yet, if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of the first. *United States* v. *Tynen, 11 Wall. 88.* " This rule," says Mr. Justice Van Syckel, " does not rest strictly upon the ground of repeal by implication, but upon the principle, that when the legislature makes a revision of a particular statute, and frames a new statute upon a subject matter, and from the frame work of the act it is apparent that the legislature designed a complete scheme for the matter, it is a legislative declaration that whatever is embraced in the new statute shall prevail, and whatever is excluded is discarded. It is a decisive evidence of an intention to prescribe the provisions mentioned in the latter act, as the only ones on that subject which shall be obligatory." *Roche* v. *Jersey City, 11 Vr. 257.*

The Misses McCartin were incompetent, in my judgment, to give the evidence objected to.

Second, as to the competency of Mrs. McCartin to give the evidence objected to. She is a defendant in her individual capacity, and also in her representative capacity. Her true position in the litigation is that of a defendant. In view of the object of the suit, it was not possible, according to any principle of procedure, to make her a party otherwise than as a defendant. The complainant seeks to compel her, as one of the executors of his father's will, to perform her duty, and also to make good to him, and the other beneficiaries, the loss they have sustained by her misconduct in office. His right of action against her is grounded on her failure to discharge duties, which were incumbent on her in her representative capacity, and she is, therefore, properly a defendant in that character, and, in my judgment, only in that character. Nothing has been gained by bringing her into court in a dual capacity, for, I think, it is undeniable that, if she had been sued in her representative capacity only, and it had been shown that she had been guilty of such misconduct in office as to render her personally liable for its consequences, the court might, after so decreeing, have enforced the decree against her individual property. The position of Mrs. McCar-

tin as a party to this suit is free from the least doubt. She is a defendant, standing in a position adverse to that of the complainant. He called her as his witness. She did not testify on her own call, but on the call of the complainant. The law gives him the right to make her his witness. The statute declares, that in all civil actions in any court of record in this state, the parties thereto shall be admitted to be sworn, and give evidence therein, when called as witnesses by the adverse party in such action. *Rev. p. 378 § 2.*

There is nothing in the statute of 1880 which either destroys or impairs this right. It stands to-day in all its original vigor. Either of the defendants had an undoubted right to call the complainant to show—if such was the fact—that by a transaction between Henry M. Traphagen and himself he had lost all right of action against Mr. Traphagen or his estate. And the complainant had a like right to examine either of the defendants, who stood in a position of actual hostility to him, for the purpose of eliciting evidence which would enable him to maintain his action.

Mrs. McCartin was, in my opinion, a competent witness to give the evidence objected to.

The remaining questions arise on the merits. Several claims are made by the bill which were either abandoned on the hearing, or rejected by the court at the close of the argument. They will not be discussed now. Two, however, remain to be considered. The first grows out of a misappropriation. In August, 1870, the executors invested $9,500 of the moneys of the estate in the purchase of a house and lot in Jersey City. Prior to the purchase by the executors, the title was held by Mrs. McCartin and her nephew, Myles Tierney. She and he conveyed to herself as executrix, and to Mr. Van Vorst and Mr. Traphagen as executors; $6,500 of the purchase-money was paid, on the delivery of the deed, with funds of the estate then in the exclusive custody of Mrs. McCartin. The house and lot were conveyed subject to a mortgage of $3,000, which Mrs. McCartin subsequently paid with funds of the estate. The $6,500 paid on the delivery of the deed was divided, almost simultaneously with its

payment, between Mrs. McCartin and Mr. Tierney, Mrs. Mc-
Cartin retaining $5,100, and giving Mr. Tierney the balance.
This division was made to carry out the terms of a settlement of
some ventures in which Mrs. McCartin and Mr. Tierney had
been jointly interested, and which settlement they agreed upon
and concluded on the day the deed was delivered and the $6,500
paid. The use thus made of the moneys of the estate was wholly
unauthorized. The executors had no authority, under the will or
otherwise, to purchase land, and their appropriation of the moneys
of the estate for that purpose was a willful misappropriation. The
proof is clear, by the mouth of Myles Tierney, that Henry M.
Traphagen participated actively in the purchase. He would,
therefore, if alive, be answerable for the loss which may result
from it. His liability, in this respect, belongs to the class which
can, as has already been shown, be enforced against his legal
representative. He, however, derived no benefit of any kind
from the purchase, but Mrs. McCartin did. The purchase was
manifestly made in her interest and for her advantage. She re-
ceived $5,100 of the purchase-money. The principal part of the
sum misappropriated went into her pocket. There can, therefore,
be no doubt about her liability. The evidence against Mr. Van
Vorst is not sufficient to justify a judgment that he is liable.
Mrs. McCartin testifies that he knew that the purchase was con-
templated, and consented that it should be made, while he swears
that he knew nothing about it. In this condition of the evidence,
it is clear that there is not sufficient proof to support a decree
against him. The house and lot are still held as an asset of the
estate. No change has been made in the title since they were
conveyed to the executors. They must be sold under the direc-
tion of the court. If the sale shall not produce a sum sufficient
to make good to the estate the loss resulting from the misappro-
priation, Mrs. McCartin and the administrator of Henry M.
Traphagen, deceased, must pay the deficiency.

The only question which remains for consideration on this
branch of the case, is, whether any discrimination should be made
between Mrs. McCartin and the administrator, as to the order in
which they shall stand liable for the deficiency. Difference in the

degree of liability, owing to difference in the extent of the culpability, has been recognized by the courts, in cases of the class to which this case belongs, ever since the decision in *Charitable Corporation* v. *Sutton, 2 Atk. 400*. Mr. Lewin states the rule, now in force on this subject, as follows : " Though, as respects the remedy of the *cestui que trust*, each trustee is individually responsible for the whole amount of the loss, whether he was principal in the breach of trust or was merely a consenting party, yet, as between the trustees themselves, the loss may be thrown upon the party on whom, as the recipient of the money or otherwise, the responsibility ought, in equity, to fall ; or, if he be dead, upon his estate." *Lewin on Trusts 776*. It requires no argument to show that, in view of the facts of this case, Mrs. McCartin must be decreed to be primarily liable. And the court may, in order to compel her to bear the full measure of her responsibility, sequester that part of the estate to which she is entitled under the will, and apply it in discharge of her liability.

The remaining claim rests on a charge that the executors, in violation of their duty, released, without consideration, valuable parts of certain lands, upon which they held a mortgage, and that in consequence serious loss resulted to the estate. The executors, on the 3d of May, 1870, conveyed certain unimproved lands, lying on the outskirts of the city of Newark, to Nehemiah Perry, for the sum of $40,000 ; $10,000 of the purchase-money was paid in cash, and a mortgage given on the lands conveyed for the balance. The mortgage was payable at any time within five years from its date, and bore interest at the rate of seven per cent. per annum. Mrs. McCartin took possession of the mortgage and cash. For some years prior to this date, she had had the exclusive possession of the other securities belonging to the estate, and had also performed the principal duties incumbent on the executors. Soon after his purchase, Mr. Perry procured a map to be made of the lands, on which streets were laid out and the lands divided into city lots. Some of the streets so laid out were subsequently opened and graded. On the 21st of April, 1871, the executors released to Mr. Perry nine of the lots covered by their mortgage, and on the 19th of

August, 1872, they executed another release to him, releasing twenty-one other lots. Both releases were executed without the payment of any part of the mortgage debt. The lots released were some of the most valuable of the tract. The mortgage was subsequently foreclosed, and the mortgaged premises purchased at the foreclosure sale, in October, 1878, by the executors, for $15,000. They are still held as part of the assets of the estate. The proof shows, that they cannot be sold now for enough to restore to the estate the amount of the mortgage debt. The claim of the complainant is, that his mother and Mr. Van Vorst and the administrator of Mr. Traphagen are bound to pay him, and the other beneficiaries under the will, the present value of the land released, or so much thereof as may be required to make good to · them the amount of the mortgage debt, after crediting thereon whatever may be realized from the sale of that part of the mortgaged premises still held by the estate.

There can be little doubt, in view of the pecuniary condition of one of the persons against whom this claim is asserted, and the ties which exist between another and those who are to be benefited by its judicial recognition, that this suit is prosecuted mainly, if not solely, for the purpose of fastening this claim on the estate of Henry M. Traphagen, deceased. Mr. Van Vorst is an old man, hopelessly insolvent, without property, and without expectations. A decree against him would, in all probability, be utterly worthless. Mrs. McCartin is the mother of the complainant and the other beneficiaries under the will. She and they all reside together as one family, and have continuously since the death of the husband and father in 1859. The family occupy her house. She is the head of the family, and, as such, exercises the chief authority, and receives from her children the respect and obedience which her position entitles her to. The relations between the mother and her children have always, so far as the evidence discloses, been of the most affectionate and confiding character. They have lived together in the utmost harmony, having apparently no interests or purposes which were not mutual and common. The love which the mother has always exhibited for her children has been a sure guarantee to

McCartin v. Traphagen.

them, that she would never consciously do an act which she thought it was possible could result in harm or loss to them. Under these circumstances, it cannot be believed that the son in whose name this suit is brought, or that either of the children in whose interest it is prosecuted, would, if their mother had alone been liable, have allowed it to be brought. Nor is it possible to believe, that if a recovery is had against the mother, the children will allow the decree to be enforced against her. These considerations make it almost absolutely certain, that this suit is the result of a family combination to fasten this claim, either in whole or in part, on the estate of Mr. Traphagen. Such a combination to enforce a just claim, by due process of law, while all the proofs, both for it and against it, were fresh and clear, and easily accessible, would perhaps, even in a case where the persons seeking to establish it had arranged in advance, with one of the persons liable, not to enforce it against him, but compel the other to pay the whole, be free from objection on legal grounds. But the fact that parties, standing apparently in an attitude of hostility to each other, were not so in fact, but were, in truth, animated by a common purpose—that their ostensible positions towards each other in the litigation were deceitful—would induce a court always to be extremely vigilant to see to it, that a claim which was false in fact was not pronounced just.

The case under consideration is, however, of an entirely different complexion. Here the claim sought to be enforced is an extremely stale one; no attempt was made to enforce it until the person against whom it is mainly aimed was deprived of all power to resist it, by death; nor until much, if not the entire body, of the evidence which may have existed, tending to show that it was groundless, had, by the lapse of time, been either entirely destroyed, or become so obscure as to leave scarcely a trace of the truth. The releases were executed in 1871 and 1872; some of the beneficiaries were present at their execution; the fact that they had been executed was known and fully discussed just prior to the institution of the suit to foreclose the Perry mortgage in 1877; the loss resulting from their execution

22

was demonstrated and made known by the sale of the mortgaged premises in October, 1878; Mr. Perry and Henry M. Traphagen were both then living; the former did not die until November, 1881, and the latter not until May, 1884; the complainant attained his majority in February, 1880; his sisters were of full age when the releases were executed, and his brother became twenty-one in 1873. This suit was not instituted until July, 1886, more than six years after the complainant attained his majority, and nearly eight after the sale of the mortgaged premises. Great delay is a good bar in equity. Courts of equity have, from the earliest times, upon general principles of their own, even where there was no analogous statutable bar, refused relief to stale demands. More than one hundred years ago Lord Camden said : "A court of equity, which is never active in relief against conscience, or the public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth the activity of a court of equity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore from the beginning of this jurisdiction there was always a limitation to suits in equity. *Smith* v. *Clay*, reported in a note to *Deloraine* v. *Brown, 3 Bro. C. C. 639, [Amb. 645]*. The wisdom of this principle, both as a rule of justice and a regulation for the benefit of the public welfare, is so obvious that it has been universally adopted. *2 Story's Eq. Jur.* § *1520 and notes*. The reason of the rule is apparent, and consists in the difficulty and, in many cases, the impossibility, of ascertaining, after a great lapse of time, the facts necessary to enable the court to exercise its power with safety. He who delays asserting his rights, until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure, that it is impossible for the court to see, whether what seems to be justice to him is not injustice to his adversary, should be denied all relief, for, by his laches, he has deprived the court of the power of ascertaining, with reasonable certainty, what the truth is, and thus of doing justice.

McCartin *v.* Traphagen.

Tested by this rule, it is plain, I think, that the claim made in this case should be rejected. The persons making it did not assert it until their delay had put them in the best possible position and their adversary in the very worst. They seek to turn their fault into an advantage. The evidence which they produce in support of their claim, consists largely of written matter, which endures notwithstanding the flight of time, while living witnesses both forget and die. From the character of the claim, it is manifest, that the only defences which could have existed against it were such as rested entirely in the knowledge and judgment of living witnesses. The important question is, What were the circumstances under which the releases were executed? Mrs. McCartin swears that she has no recollection of executing but one release, and that she executed under a representation that it embraced only two city lots. At this time she had possession of the mortgage and exercised almost a supreme control over the affairs of the estate, and managed them, with the assistance of her daughters, as she thought proper. The duty of safely keeping and protecting the securities of the estate rested on her. Now, if it be true, that she was tricked into executing a release of nine or twenty-one lots under the belief that the release only embraced two, may it not also be true, that the signatures of the other releasors were procured by the practice of a similar fraud? And may it not likewise be true, that the fraud by which the releases were obtained, was so shrewdly planned and so cunningly executed that the most cautious person would have been entrapped by it? What the truth is cannot be discovered now. Mr. Traphagen and Mr. Perry are both dead, and the recollection of Mrs. McCartin and Mr. Van Vorst is so faded, that it is quite evident, that when they attempt to tell what they recollect about the transaction, they give dim impressions and conjectures rather than actual recollection.

But suppose there was no fraud? Who can say, after the lapse of fifteen or sixteen years, that the acts of the executors, in executing the releases, were not, in view of the considerations which controlled their judgment, wise and prudent, and just such as they ought to have done? They are not liable for mere

errors of judgment, such as prudent persons, exercising ordinary caution, under like circumstances, might have committed. The measure of their duty was this : they were bound to use the same degree of care that a person of common prudence, would ordinarily exercise, in the management of his own affairs of like character. " The law," says Professor Pomeroy, " does not cast upon a trustee an extraordinary duty, nor demand an extraordinary care, nor hold him liable for mere error of judgment; much less does it make him an insurer of the property. If he has exercised the care and judgment of ordinary prudent men in their own affairs, he will not be chargeable for his mere errors of judgment, nor for accidental injuries or losses." *2 Pom. Eq. Jur.* § *1070.* To be able, therefore, to form a just judgment, whether what the executors did was within or without the line of their duty, it is necessary, that we should have before our minds all the considerations which led to the judgment on which they acted, and that we should weigh them now just as a man of ordinary prudence and discretion would have weighed them then. After a cause has produced its results, it is much easier to see the connection which existed between cause and effect, than it is to see, in advance, what effect a cause will produce. The foolish may be wise after an event has happened, but when an act may produce one of two directly opposite results, it is only a person possessing the penetration of a prophet that can foresee which of the two will certainly occur. It was this consideration which once led Lord Hardwicke to remark, in substance, that it is by no means just in a judge to say, after bad consequences have arisen from an act done by a person exercising fiduciary powers, that he should have foreseen what subsequently happened, and therefore be held guilty of a breach of trust. If he did not foresee what no person of ordinary foresight, standing in his place, could have foreseen, he has violated no duty, and incurred no liability.

It would be impossible for us now to get back in expectation and judgment to just where the executors were at the time these releases were executed, but this much may be remembered as part of the familiar history of those times : that it was believed,

McCartin *v.* Traphagen.

by even the shrewdest and most cautious, that suburban property, like that with which they were dealing, located in the outskirts of a growing and prosperous city, possessed greater possibilities than property of almost any other kind. Such investments had, in many instances, resulted in great fortunes, and the belief was almost universal that they afforded the surest road to speedy and great wealth. The proofs show, that, at the time the releases were executed, and for some years afterwards, Mr. Perry was reputed to be a gentleman of large wealth, abundantly able to raise the money necessary to pay the mortgage debt; he had the right, by the terms of his mortgage, to pay at any time; he threatened, if the releases were not executed, that he would pay; the investment was a choice one; the debt was secured by the bond and mortgage of a gentleman reputed to be worth $100,000; it produced an annual income to the estate of $2,100; it was the duty of the executors to preserve the investment, if they could; the proofs now before the court, on the part of the complainant, show, that that part of the mortgaged premises which remained pledged for the mortgage debt, after the releases were executed was worth, according to the prices prevailing in 1872, over $43,000; this estimate may be less than the same witness would have made in 1872, before his judgment, respecting its value, was enlightened by any of the events which have since occurred. What estimates and whose judgment Mr. Traphagen acted on in executing the releases, we do not know; he cannot tell us now; his lips are closed forever; there is no reason to suspect that he was controlled by fraudulent motives; no charge of that kind is made; there is no hint in the evidence that his relations with Mr. Perry were such as would have been likely to induce him to disregard his duty to favor Mr. Perry; so far as appears, he was entirely free from the least temptation to betray his trust; his interests, as well as his inclinations, were such as would have naturally constrained him to guard, rather than endanger, the rights of his *cestuis que trust;* and the fact that his acts, which are made the foundation of this claim, have so long stood unquestioned, serves to produce a strong conviction in my mind, that they were not assailed before because, while the recollection of

the considerations which led to them was fresh and clear, they were known to be right and unassailable, and that the reason they are challenged now is, either because the recollection of the facts which led to them has become to a great extent effaced, or because it was supposed all evidence of them is lost. The persons in whose behalf this claim is made, have delayed all attempt to establish it, by judicial proceedings, until the tongue of the person most deeply interested in resisting it has been silenced by death, and until the memory of all others, who could have given evidence respecting it, is greatly faded or totally lost. They have delayed until, by the lapse and decay of time, their adversary has become defenceless. They are too late. Their claim, in my judgment, must be rejected.