Harry G. Hendricks and Oscar A. Klamer were appointed receivers of the Earl Radio Corporation, insolvent, November 26th, 1929, and, from time to time, each entered into bonds to the chancellor, aggregating $150,000 for the faithful performance of his trust. The receivers continued the business of the corporation, under authority of the court, until July following, when the assets were sold. The proceeds of operation and from the sale of assets were deposited in various banks to the joint account of Hendricks and Klamer, as receivers. The receivers divided their labors, Hendricks taking charge of operations, including the finances, Klamer devoting most of his time in an effort to reorganize the concern; he was its heaviest creditor, and as chairman of the creditor's committee, had given much effort to restoring the corporation while receivership was impending, and was appointed co-receiver *Page 437 
because of his intimacy with its affairs and the prospects of a resuscitation under his administration. With Hendricks in Newark, and Klamer, a resident of Evansville, Indiana, most of the time away on his end of the business, and the consequent inconvenience, the court, upon Hendricks' petition, made an order permitting Hendricks to withdraw funds from the banks, upon his own signature. The receivership operations were extensive, and Klamer acquiesced. All moneys received from all sources were deposited to the joint accounts and the withdrawals on Hendricks' signature, up until the business was closed out, are accounted for. Later Hendricks withdrew, in various amounts, $149,000, which he appropriated to his own use. On December 10th, 1931, Hendricks filed an account, signed and sworn to by him alone, purporting to be the joint account of Hendricks and Klamer, receivers, as of July 1st, 1931, charging the receivers with receipts of $1,963,390.09, and praying discharges for $1,631,101.47, leaving a balance of $332,288.62. The master who audited the account, certified his approval, and that the receivers had the balance in hand as of July 1st, 1931. The certification was true; the peculations occurred later. Upon its heels, however, the shortage was discovered. Hendricks was removed and Jacob L. Newman was appointed in his place, and he and Klamer caused a complete audit to be made from the beginning of the receivership to the time of Hendricks' removal, which disclosed an orderly administration, save for twelve checks signed by Hendricks, aggregating $149,000 misappropriated by him. His sureties were ordered to pay, and it was ordered, "upon making such payment under their respective bonds hereinbefore mentioned, it be subrogated to the rights of the receivers of defendant, Earl Radio Corporation, to commence suits in the name of the receivers, but at the sole cost and expense of said surety companies, and to recover from any person or persons any of the moneys of defendant, Earl Radio Corporation, wrongfully abstracted by the said Hendricks, and against any persons, firms or corporations liable to the said receivers for improperly paying out any of said moneys on checks signed by the said Hendricks or from wrongfully permitting said moneys to be withdrawn by *Page 438 
the said Hendricks from the funds of the said Earl Radio Corporation receivership."
Hendricks' bondsmen, three surety companies, paid the defalcation, and by an order of November 29th, 1932, they were "permitted to have and occupy the status of creditors of Earl Radio Corporation, with claims for the amounts severally paid by them, for the purpose of filing exceptions to the intermediate account of Oscar A. Klamer and Harry G. Hendricks, and to the final account filed by Jacob L. Newman and Oscar A. Klamer, and to seek an order or decree that Oscar A. Klamer, one of the receivers of Earl Radio Corporation, is jointly liable with Harry G. Hendricks for the misappropriation and embezzlement by Harry G. Hendricks for $149,000 of the funds of the receivership of Earl Radio Corporation, and seeking a decree that said Klamer pay such sums, with interest, to the said petitioners."
The surety companies filed exceptions, in substance, charging Klamer with carelessness in permitting Hendricks to handle the funds unchecked, and responsibility for their loss, calling upon him to make them whole. The method is novel; the effort original.
The sureties are not creditors, factually or in any legal aspect, of the insolvent corporation; it owes them nothing. Theex parte order, giving them leave, as such, to file exceptions, if it purports to give them the status of creditors, is abortive; the court's ipse dixit cannot create the relationship; the order was improvidently entered. If the surety companies have a cause of action against Klamer, its vindication lies in a plenary suit. In this account of his stewardship, Klamer's responsibility for the trust funds is to the creditors of the corporation, and to them he has accounted to the last penny, including the $149,000 shortage; paid by Hendricks, via his sureties.
But passing by this indirect attempt to reach Klamer, upon what conceivable principle of law can he be held accountable to Hendricks' bondsmen? They claim, of course, that had he exercised reasonable care, opposed or ignored the court's order, and insisted upon joint signatures to checks, the defalcation could not have happened. We will not enter upon a discussion *Page 439 
of the merits of this proposition. Assuming all this to be so, and that his failure of ordinary circumspection lent itself to Hendricks' mischief, Klamer's liability would be to the estate, not to Hendricks' sureties; he owed them no duty of precaution against Hendricks embezzling. They were Hendricks' keepers; not he. They stood sponsor for him to the chancellor, vouched that he would not tap the till, and bound themselves to restore, if he did. He did; they did. Hendricks was first in order of liability to the estate. McCartin v. Traphagen's Adm'r, 43 N.J. Eq. 323;affirmed, 45 N.J. Eq. 265; Williams v. McKay, 46 N.J. Eq. 25.
Surely Hendricks could not recover from Klamer because Klamer did not arrest his fraudulent conduct. Hendricks' sureties stand in his shoes; but if they occupied those of the estate, the same order of liability would prevail.
If the surety companies' prosecution of Klamer is by way of subrogation to the rights and remedies of the estate, we are unaware of any principle or authority, upon which this equity has ever been extended to a principal debtor. The order just recited, subrogates them to the insolvent company's rights against Hendricks and those who profited through him at the expense of the company.
Had Klamer been called upon to pay, his recourse to Hendricks and over against his sureties, in right of the estate, by way of subrogation, would be understandable. The reverse procedure makes for our confusion.
The surety companies have the shoe on the wrong foot. The wrong-doer pursueth the injured. Two cases, Southern Surety Co.
v. Tessum, 228 N.W. Rep. 326, and In re Whitney's Estate,11 Pac. Rep. 2d 1107, may persuade them that they cannot lay their sullied ward on Klamer's doorstep and call him "Klamer, Jr."
 The exceptions will be dismissed. *Page 440