On September 23d 1921, Anton J. and Mary Parma, husband and wife, with their son, John Parma, the defendant, acquired title to the premises No. 913 Ann street, North Bergen, New Jersey. The parents took a two-thirds interest by the entirety and John the remaining one-third. Anton died on June 11th, 1927, and his interest, by operation of law, vested in Mary, his wife. John resided with his parents during the period of their lives. Mary died on January 18th, 1936, at the age of seventy-six years. She was a Bohemian, and spoke that language.
On November 3d 1932, Mary conveyed her two-thirds interest in the premises to John (Exhibit D-5). The validity of that conveyance is now attacked by the complainants, who are the remaining children of the decedents, Anton and Mary. The bill also asks for an accounting.
It is alleged that at the time of the conveyance, Mary was enfeebled in body and mind; that she failed to appreciate the nature of her acts; that she was under the domination of the defendant, and that she lacked independent advice.
These allegations the defendant denies. He avers that his mother, at the time alleged and until her death, was mentally alert and competent. The complainants, he says, acquiesced in the conveyance, and he charges them with laches.
In testifying in behalf of the complainants, Doctor Pindar said that in the summer of 1930, and at various times in the year 1931, he had treated Mary. He had spoken to her through the medium of an interpreter. She suffered from failing eyesight, kidney trouble, hardening of the arteries and retarded reflexes. Her illness was of a progressive type. While under his professional care, Mary lapsed into a coma which continued for three or four days. The death certificate (Exhibit D-1), indicates her death resulted from a "diabetes cardiac collapse."
Doctor Olpp, testifying in behalf of the defendant, said that on October 4th, 1932, the complainant Eugene Parma brought his mother, Mary, to his office and requested that she be given a mental examination. He examined her in the presence of Eugene and discovered no signs of mental ill *Page 592 
health or decay. Her reflexes were normal. He learned she once had a diabetic condition which produced a coma. He stated that patients so afflicted gradually recover. Her failing eyesight was an incident of her age. She was able to see. He spoke to her in English and in German, both of which she understood. She gave immediate responses to his questions, and carried on a conversation with him. He declared that she was in no way noncompos mentis. She had the ability to sign and execute documents. She gave evidence, he said, of a clear appreciation of the value and the quality of her acts.
Approximately one month after Doctor Olpp's examination, the deed in question was executed and acknowledged by Mary in the office of the Czechoslovakian consul in the city of New York, before a notary public. The visit to the Czechoslovakian consulate for the execution of the deed was made at the suggestion of the decedent's attorney, Lionel Isaacs, who was of the opinion "that she (Mary) should have advice outside of a law office." Accompanying Mary at the time, was her son, John, the defendant, and her sister, Barbara Kubik. Barbara Kubik, testifying in behalf of the complainants as to that transaction, said the deed, before its execution (Exhibit D-5) was read to the decedent and to her (the witness) in the Bohemian language, by a consulate attache, a Mr. Elbo; that then present were two other persons. John, the defendant, was in an outer room at the time. When asked by the consulate attache if she knew what she was doing, Mary replied in the affirmative. On cross-examination, Barbara was asked the following questions: "Q. When the deed was read to your sister in Bohemian what did she say? A. She answered, `I am going to give my son the house. I think that will be all right. He is a good boy, always honest.' Q. Your sister understood what she was doing? A. She certainly did. Q. When it was read to her in Bohemian was John present or was he in the other room? A. He was in the room all the time but only when she signed it he was in the next room. Q. Didn't you tell me he was in the waiting room? A. Only when she signed the deed and when I signed he was in the other room." *Page 593 
Barbara further declared that her sister Mary was in good health; that she carried on a regular conversation with her; and thoroughly understood the business in which she was then engaged. The attention of the witness was called to Exhibit D-7, an affidavit executed by Mary (Marie Parma), as follows:
"I am a resident of 913 Ann Street, North Bergen, New Jersey, which property is now owned by my son, John Parma, residing with me.
"Sometime ago I executed a paper writing which I understand to be a will, in which paper writing is contained a statement to the effect that my son, John Parma, was indebted to me at that time for certain moneys which he agreed to pay towards the purchase of a one-third interest in the property at 913 Ann Street, North Bergen, New Jersey.
"My said son, John Parma, has paid all sums due towards the purchase of said property and is now the sole owner thereof.
"The paper writing referred to above is in the possession of my son, Edward Parma, and I am unable to obtain custody thereof.
"I have executed a last will and testament subsequent to the one in the possession of my son, Edward Parma, which last will and testament executed subsequent to the paper in the possession of my son, Edward, properly expresses my intentions and wishes.
"I hereby state that my son, John Parma, is not indebted to me for any part of the purchase price of said house at 913 Ann Street, North Bergen, N.J., but on the contrary he has paid in full all sums which he agreed to pay thereon and is now the sole owner thereof.
"Any statement contained in any paper writing heretofore made by me to the effect that my son, John Parma, is indebted to me in any sum for any transaction is false and untrue.
"I am of Bohemian extraction and do not read or write English. This instrument was read and translated to me by my sister, Barbara Kubik, who was present at the time of the drawing and signing of this paper, and who has made known to me the contents thereof by translation and explanation.
"This affidavit is made in order to obviate any question arising in the future as to former wills or writings by me at any time made.
 M. PARMA. "Sworn and subscribed to before me this 28th day of September, 1933. CYRIL J. McCAULEY, a Master in Chancery of New Jersey.
"I, Barbara Kubik, witnessed the execution of this affidavit, and translated same to my sister, Marie Parma, who signed same as her voluntary statement.
BARBARA KUBIK." *Page 594 
She, Barbara, said she read the above affidavit in the Bohemian language to her sister, Mary. She also admitted that she, Barbara, read and signed the above notation on the affidavit.
Cyril J. McCauley, a member of the bar of this state, associated with the law firm of Isaacs Gunther, where the affidavit (Exhibit D-7) was prepared, testifying in behalf of the defendant, said he handed the affidavit to Barbara and asked her to read it in Bohemian to Mary; that Barbara, after first silently reading the affidavit, then read it aloud to Mary in the Bohemian language. Then Mary signed it. After witnessing Mary's signature, the witness wrote the notation at the foot of the affidavit which was signed by Barbara. The affidavit (ExhibitD-7), was signed ten months after the execution of the deed in question.
The defendant testified that after his father's demise, he resided with and supported his mother until her death; his monthly contributions to her averaged $50. She attended to all the household duties in their home. There is no evidence indicating that John's initial one-third interest in the premises, and his parents' occupation of them, was a source of profit to him. He, apparently, received no return on his investment.
In a will which Mary executed (Exhibit C-1) on June 21st, 1932, she bequeathed to her son, John, the defendant, the sum of $500 in addition to an equal share in her residuary estate. That partiality on the decedent's part towards John is pointed to by him as evidence of his mother's affection and an appreciation of his services to her.
The complainants disputed John's testimony of parental maintenance and declared he contributed very little to his mother's support.
An unfriendly feeling existed between the complainant Edward and his mother, Mary. It apparently developed through the possession of papers by Edward which his mother claimed she was entitled to. Mary also found fault with the manner in which Edward handled the affairs of his father's estate — she having an interest therein. She complained to her attorney, Lionel Isaacs, about those matters and sought *Page 595 
his help. Isaacs, in consequence, sent Edward two communications dated respectively July 12th, 1932, and August 2d 1932 (Exhibits D-3 and D-2), in which he requested Edward to return the papers belonging to his mother, and to render an accounting, as executor, of his father's estate.
The complainant Eugene Parma said friction arose in the family because the complainant Edward showed resentment at not being named executor in his mother's will.
Edward testified that he did not learn of the execution of the deed from his mother to his brother, John, until sometime in 1933. He said that when he obtained that information, he proceeded to the office of the register of Hudson county and took a copy of the deed from the records in that office. He then visited his mother and told her he was much surprised at her action, and felt that she did not do the right thing and that trouble consequently would arise in the family. His mother in reply said, "I had to do it, there was no way out, that he [John] was continually at me. I am a sick woman, and cannot stand it any longer, so I had to do it. I know John is all right. I know he is honest and won't cheat anybody." That testimony was not corroborated and, I might add, is not convincing. On being asked why he did not initiate proceedings to set aside the transaction before this suit was instituted, Edward replied that it required a large amount of money and his younger brother had no money.
The testimony of the witnesses produced on behalf of the complainants, does not indicate that Mary was incompetent or mentally unfit. Their evidence, as I view it, presents the inference that she acted quite normally; conversed in an intelligent manner and attended to such ordinary duties as required her personal attention. I am satisfied John was considerate of his mother's comfort. He resided with her, maintained her, and displayed a natural and filial devotion which, I believe, found response in his mother's generous exhibition of partiality to him.
There undoubtedly existed between John and his mother a relationship of trust and confidence. Mindful of that relationship, and due to it, and upon the commendable advice of counsel, John conducted his mother to the office of the *Page 596 
Czechoslovakian consul in New York City, where she was able to, and did, freely converse in her native language with a disinterested and impartial attache of that office, who rendered her a desired service in the transaction of the transfer of the premises. Mary's then act, I believe, was the result of contemplation, and that of a free and voluntary agent.
In Haydock v. Haydock's Ex'rs, 34 N.J. Eq. 570, the court said:
"* * * where a person enfeebled in mind by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee."
That quoted language of the court admirably fits the situation in the instant case and makes needless further comment. Mary's acts were so surrounded with recognized legal safeguards as to repel the entertainment of any implication or presumption of undue influence, lack of understanding, the want of independent advice and the exercise of coercive methods.
In LeGendre v. Goodridge, 46 N.J. Eq. 419 (at pp. 425,426), the court said:
"To justify a decree that undue influence has been exercised, in any case, the court must be convinced, either by proof of actual coercion, mental or physical, or by the evidence furnished by circumstances, that the free agency of the grantor had been so far destroyed that the act brought in question would not have been done if the grantor had been left to himself and free from the coercive influence. It must appear that the act is the result of the domination of another mind rather than the expression of the mind of the grantor. But without such evidence, a deed which appears to have been executed under all the safeguards provided by law for the protection of the grantor against coercion and imposition, though voluntary and supported by no consideration but love and affection, is entitled to stand on its own inherent strength. The grantee is not required to prove that it was fairly obtained." *Page 597 
See, also, Chandler v. Hardgrove, 124 N.J. Eq. 516.
The evidence indicates that the complainants had knowledge of the transaction of the conveyance several years before they instituted this proceeding. They slept on that knowledge, and, in my opinion, are chargeable with laches. McCartin v. Traphagen,43 N.J. Eq. 323; Industrial Savings and Loan Co. v. Plummer,84 N.J. Eq. 184; 92 Atl. Rep. 583.
The conveyance to John did not strip his mother, Mary, of her entire estate. It was not an improvident gift. Mary died seized of real and personal property which she disposed of by her will. Under all the facts and circumstances, I feel that the bill should be dismissed. I shall advise an order to that effect.