WASHINGTON B. WILLIAMS, receiver of the Mechanics and Laborers Savings Bank,

*v.*

HUGH W. McKAY and others.

THE SAME

*v.*

PATRICK REILLY'S EXECUTORS.

1. Where the charter of a savings bank provides that, "said corporation shall invest no money   *   *   *   on bond and mortgage except on real estate worth at least double the amount of the sum invested, above all encumbrances," it requires that the landed security shall be worth double the encumbrances upon it and the investment in it, combined.

2. The managers of a savings bank, without capital and incorporated for the express purpose of receiving deposits of moneys and executing trusts, using and improving such deposits in a prescribed manner and dividing the net income and profits among the depositors and repaying the deposits, are bound to invest the bank's money, not only according to the requirements of the charter of the bank, but also with a prudence commensurate with the character and objects of the institution.

3. In discharge of their obligations, such managers are authorized to define the duties of the officers of the bank, and, in order to facilitate the transaction of business, appoint small committees from their number to superintend those officers and dispose of detail and routine work, but they are, at the same time, bound to a reasonable supervision of such officers and committees, and to knowledge of their business methods.

4. In a suit by the receiver of such a bank against its managers, where a loss is shown to have resulted from dishonesty, disregard of the charter's requirements or culpable negligence, all the managers who are chargeable with such faults must be held alike responsible, so far as the receiver is concerned, without reference to the degree of their dereliction, but, as between themselves, there may be grades of liability according to the degrees of culpability.

5. Such grades may be as follows: *First,* those managers who were concerned in, and who profited by, an unlawful, imprudent or negligent transaction that resulted in loss; *second,* those who, though concerned in such a transaction, did not profit by it; *third,* those who, though they did not know of the trans-

action which occasioned the loss, by the negligent and improper discharge of some duty which was specially imposed upon them, made such loss possible; *fourth,* those who, though they did not know of the transaction which occasioned the loss, negligently omitted to perform a duty specially charged upon them, the proper performance of which would have prevented the loss; and the *fifth,* those who, though not charged by the by-laws with any special duty, failed to exercise that reasonable circumspection over the affairs of the bank which the law demands of them.

6. Loans upon second mortgage, although permitted by the charter of the savings bank, must be condemned as imprudent where the first mortgage is large and the investor is obliged to be perpetually ready to pay the first encumbrance.

7. Where the charter of a savings bank required that the landed security for an investment shall be worth twice the encumbrances on the land and twice the sum invested, and in case of a specified investment it was worth double the previous encumbrances and double a portion of the investment, but not double the entire investment—*Held,* that the investment was an entirety, and that the fact that the landed security was not worth twice the encumbrances and twice the whole investment, made the entire investment illegal, and hence, that no part of it was lawful.

8. Where the charter of a savings bank provided, "That said corporation shall invest no money in any public stock other than such as are created under the laws of the United States, of New Jersey, New York, or in the public stocks of Jersey City or Newark in this State, or of the cities of New York or Brooklyn, in the State of New York, authorized by the laws of those States respectively, nor on bond and mortgage, except on real estate worth at least double the amount of the sum invested, above all encumbrances, nor in stock of any incorporated company whatever"—*Held,* that investment upon mere personal security was unauthorized and illegal.

9. A savings bank manager, in the discharge of his duties, is bound to possess ordinary competency, and cannot excuse misconduct by pleading gross ignorance.

10. Managers of a savings-bank will be held to a knowledge of the provisions of its charter, unless they make it appear affirmatively that they have excusably mistaken the meaning of those provisions.

11. An excusable mistake in the meaning of a law is one which occurs after all means of information that suggest themselves to a man of ordinary care and prudence have been exhausted.

On bills, answers, replications and proofs.

*Mr. Washington B. Williams,* receiver, *pro se.*

*Mr. Theodore Runyon,* for Patrick Reilly's executors.

*Mr. A. Q. Garretson,* for Patrick Kelly and John Murphy.

*Mr. James B. Vredenburgh* and *Mr. William M. Dougherty,* for James Keary and Patrick Meehan.

*Mr. Gilbert Collins,* for Hugh W. McKay, Patrick Sheeran, Thomas C. O'Callaghan, Henry Carrol, Matthew Monks, the executors of Jeremiah C. Sweeney, and the executors of Owen T. W. McDonald.

*Mr. William A. Lewis,* for Patrick Farrelly.

THE CHANCELLOR.

By the first mentioned of these suits, the receiver of the Mechanics and Laborers Savings Bank seeks to charge Sidney B. Bevans, George P. Brock, Henry Carroll, Adam J. Dittmar, James W. Donelan, Æneas Fitzpatrick, Patrick Farrelly, John Halliard, James Keary, Patrick Kelly, Hugh W. McKay, John McBride, John McGuigan, the executors of Owen T. W. McDonald, Patrick Meehan, John Miller, Matthew Monks, John Murphy, Thomas C. O'Callaghan, Charles W. Perveil, the executors of Patrick Reilly, James J. Reid, the executors of Jeremiah C. Sweeney, Patrick Sheeran and Robert Smyth, with liabilities for losses to that savings bank while the persons named were its managers, and to recover therefor. The right to the relief asked is based upon the alleged negligence of those officers in the management of the affairs of the bank. The delinquencies charged were classified, when this case was heard upon demurrer (*Williams* v. *McKay, 13 Stew. Eq. 189, 194*), as follows:

"*First,* in the investment of moneys, in a large number of specified instances, on insufficient landed security, and in violation of the charter of the company; *second,* in the loaning of other moneys on mere personal security; *third,* in permitting the president of the bank, one John Halliard, to withdraw, without giving adequate security, and to apply to his own use, the funds of the bank; and, *fourth,* in the failure to require the president to give bond for the faithful performance of his official duties."

The bill, in the first-mentioned suit, contained allegations of dereliction of duty on the part of Patrick Reilly as treasurer of the bank, in which he alone was concerned, which, in *Williams* v. *Halliard, 11 Stew. Eq. 373,* were said to be too vague and indefinite to require an answer. Upon appeal, the court of errors and appeals (*13 Stew. Eq. 189*) acquiesced in this view of those allegations, and held, because they were so vague and uncertain as not to require an answer, that they did not render the bill multifarious. This determination led to the commencement of a suit against Reilly alone, for dereliction of duties as treasurer of the bank in allowing the bank's moneys to be unlawfully withdrawn and to be used for unlawful and improper loans, and in failing to protect such moneys from such uses. By order of this court, made on the 10th day of January, 1887, the two suits were consolidated, and they are therefore now to be determined together, as though they were one action.

The Mechanics and Laborers Savings Bank was incorporated by act of the legislature of this State, approved March 3d, 1869 (*P. L. of 1869 p. 177*). Among its corporators were the defendants John McBride, Æneas Fitzpatrick, Patrick Reilly, Sidney B. Bevans, Francis Stoveken, Charles W. Perveil, James Keary, Thomas C. O'Callaghan, Patrick Sheeran, Hugh W. McKay, Henry Carroll and John Halliard. The charter provided, among other things, that the bank should be conducted by fifteen managers, who should fill vacancies in their number; that the meetings of the managers should be held semi-annually on the first Monday of the months of June and December, and as much oftener as a majority of the managers should consider expedient; that the managers should have power to choose a president, vice-president, treasurer, and such other officers as they should deem necessary; that all officers so chosen should, respectively, give such security for their fidelity and good conduct as the managers might from time to time require; that the corporation might receive deposits of money and accept and execute all trusts confided to it; that all deposits of money received by it should be used and improved to the best advantage, and that the income and profit thereof, after the deduction of reasonable and necessary

expenses, should be divided among the depositors in just proportion; that the principal should be repaid to the depositors under regulations prescribed by the managers, and that the corporation should have power to make by-laws. The tenth section of the charter is in the following language:

" That said corporation shall invest no money in any public stock other than such as are created under the laws of the United States or the States of New Jersey, New York, or in the public stocks of Jersey City or Newark in this State, or of the cities of New York or Brooklyn in the State of New York, authorized by the laws of those States respectively, nor on bond and mortgage except on real estate worth at least double the amount of the sum invested above all encumbrances, nor in stock of any incorporated company whatever."

On March 15th, 1869, a majority of the corporators met and organized the bank, and on the 8th of June, in the same year, adopted by-laws. Those by-laws provided that the officers of the board of managers should be a president, vice-president, secretary, treasurer, and a finance committee and an executive committee, composed of three members each in addition to the president and vice-president, who were to be *ex officio* members thereof; that the order of business at the meetings of the board of managers should be: First, the reading of the minutes of the last regular and of any subsequent meeting of the board; second, the reading of the minutes of the finance committee, and passing upon its rules and recommendations; third, the reading of the reports of special committees; fourth, the reading of the treasurer's report and general statement; fifth, motions, suggestions and remarks upon the business investments of the board, present and prospective, and upon the condition of the bank's affairs; sixth, unfinished business, and, seventh, new business; also, that the president should execute all releases, satisfaction pieces, and other documents requiring the common seal of the bank, and, with the treasurer, have charge of the seal and of all bonds and mortgages, and other property and securities of the bank. By the eighth section the secretary was required, among other duties, to keep an account of the moneys received and paid out, to collect interest on bonds and all debts due to the bank, and to cause

his collections to be deposited in some bank to be named by the managers. He was also to keep the minutes of the meetings of the managers, and a book in which all applications for loans should be entered. The ninth section made it the duty of the treasurer to have custody and charge of all the securities and all evidences of indebtedness to the bank, and to report at the quarterly meetings of the managers (*a*) the cash on hand at the beginning of the quarter; (*b*) the amount received from depositors; (*c*) the amount received for interest on bonds and mortgages and loans and other securities; (*d*) the amount of principal of all investments paid in; (*e*) the amount paid to depositors and for salaries and petty expenses, and (*f*) the amount invested, and in what security, and all amounts paid and received during the quarter.

By the next section it was made the duty of the finance committee to attend to all applications for loans, and to meet, as occasion might require, for the purpose of investing and loaning the funds. The executive committee's duty was defined, by the eleventh section, to be, to take general charge and government of the bank and make temporary rules for its regulation, also to examine the books of account and securities of the bank, and at the regular semi-annual meetings of the managers report what dividend should be paid to depositors. The twenty-first section provided that the bank should not be obliged to pay any money to depositors except upon thirty days' notice to the treasurer, and the twenty-second section provided that all checks should be drawn by the treasurer and countersigned by the president, or, in his absence, by the vice-president, and be made payable to the order of the person for whose benefit the same should be intended, and that no payments under any circumstances above $25 should be made otherwise than by check upon some bank of deposit in which the institution had funds.

At the same meeting at which the by-laws were adopted, seven additional managers were chosen, although at that time the charter provided that the institution should be managed by fifteen directors, and the fifteen corporators had determined that they themselves should be such fifteen directors. Among the

additional seven persons thus chosen were the defendants Mee-
han, Smyth, McGuigan, Dittmar and Miller.

By supplement to the charter, approved April 5th, 1871 (*P.
L. of 1871 p. 1326*), authority was given to increase the managers
to such number as the corporation might direct, and the semi-
annual meeting-days, fixed by the charter, were changed to the
months of May and November.

Subsequent to the approval of this act, on May 15th, 1871, the
seven additional managers who were chosen on June 8th, 1869,
were re-elected, and, by resolution, their acts as managers, from
June 8th, 1869, were ratified.    By a further supplement to the
charter, approved March 27th, 1873 (*P. L. of 1873 p. 1300*), it
was provided that the bank should be conducted by twenty-four
managers, to be elected, from the depositors in the institution,
by the board of managers as it then existed, at its next meeting,
and that the persons thus chosen should divide themselves into
three classes at the next regular meeting of managers after the
passage of the supplement, the term of the first class to expire
on the second Monday of November, 1873, or as soon thereafter
as others should be elected in their stead, and that thereafter, on
the first Monday of each November, or as soon as their success-
ors were elected, the managers composing the eldest class should
go out of office.

This supplement further provided that, if a manager should
fail to attend meetings of the board for a year, or should neglect
to perform his duties as a member of the committee for six
months, the board might declare his position vacant and fill it
for his unexpired term.

On April 25th, 1873, twenty-four managers were elected, and
at the regular annual meeting in May they divided themselves
into classes.

The bank ceased to do business on the 8th of November, 1878.

The several defendants were connected with the corporation as
follows:

Sidney B. Bevans was a corporator and became one of the first
managers, and continued, by successive elections, to be a manager
until November 19th, 1877.    He was also a member of the

executive committee from June 8th, 1869, to November 14th, 1870, and a member of the finance committee from November 14th, 1870, to November 25th, 1872.

George B. Brock was elected a manager on April 25th, 1873, and continued in office as such until the bank closed in November, 1878. He did not serve upon any standing committee.

Henry Carroll was a corporator of the bank and one of its managers throughout the entire period of its existence. He was a member of the finance committee from June 8th, 1869, to November 17th, 1873, and of the executive committee from November, 1873, to November 20th, 1876. And he was elected treasurer of the bank on the 19th of November, 1877, but says that he declined to serve as such.

Adam J. Dittmar was not a corporator, but was elected a manager on June 8th, 1869, and served as such until his re-election on May 15th, 1871, under the authority given by the supplement to the charter, approved in that year, and thereafter he continued to serve as a manager until the bank closed in November, 1878. He was a member of the finance committee from November 17th, 1873, to November 15th, 1875, and a member of the executive committee from November 15th, 1875, to November 19th, 1877, and again a member of the finance committee from November 20th, 1876, to November 19th, 1877.

James W. Donelan was connected with the bank from a short time after its organization as clerk and assistant secretary, but he was not a manager until May 17th, 1875. From that date he was the secretary and a manager of the institution until it suspended business in November, 1878.

Æneas Fitzpatrick was a corporator. He served as a manager from June 8th, 1869, to April 25th, 1873. He was also a member of the executive committee from June 8th, 1869, to November 4th, 1870, and from November 20th, 1871, to November 25th, 1872.

Patrick Farrelly was a manager from May 15th, 1871, to November 17th, 1873.

John Halliard was one of the corporators and was a manager during the bank's existence. He was vice-president from March

15th, 1869, to November, 1870, and president from November, 1870, to November, 1878.

James Keary was one of the corporators, and was a manager from June 8th, 1869, until he resigned, in November, 1875. He was a member of the executive committee from November 17th, 1873, to November 15th, 1875.

Patrick Kelly was elected a manager on April 25th, 1873, and continued to be a manager until the bank suspended. He did not serve on either standing committee. He attended several meetings of the managers on and after May, 1871, but before his election as a manager.

John McBride was a corporator and also a manager from June 8th, 1869, until the bank suspended its business. He was a member of the finance committee from June 8th, 1869, to November 14th, 1870, and vice-president from November 14th, 1870, to November 17th, 1873.

Hugh W. McKay was a manager from November 25th, 1872, to May 20th, 1878. He was a member of the executive committee from November 25th, 1872, to November 17th, 1873, and was vice-president from November 17th, 1873, until May, 1878.

This defendant claims that he severed his connection with the institution in November, 1874. This, however, does not appear by the minutes or by proof of formal resignation; on the contrary, it affirmatively appears that he attended a meeting in December, 1874, and another meeting in November, 1877, and that he presented a formal resignation in May, 1878. This resignation is contradictory of his assertion that he severed his connection with the bank in 1874, for it is difficult to account for this resignation if he was not a member of the board when it was offered.

John McGuigan was elected a manager on June 8th, 1869, and re-elected May 15th, 1871, under authority of the supplement to the charter in that year, and continued to be a manager until November 17th, 1873.

Patrick Meehan was elected a manager on June 8th, 1869, and re-elected, under the supplement to the charter, on May 15th, 1871, and continued to be a manager until the bank sus-

3

pended business. He was a member of the executive committee from November 17th, 1873, to November 15th, 1875.

John Miller was elected a manager on June 8th, 1869, and was re-elected on May 15th, 1871, and continued to be a manager until the bank suspended business. He was a member of the executive committee from November 14th, 1870, to November 14th, 1873.

Matthew Monks was elected a manager May 15th, 1871, and continued to be a manager until the bank suspended its business. He was a member of the finance committee from November 25th, 1872, until the bank closed.

John Murphy was a manager from May 20th, 1872, until the bank closed. He does not appear to have served upon any of the committees.

Owen T. W. McDonald was a manager from November 17th, 1873, until the bank closed, and, for the same period, he was a member of the finance committee.

Thomas C. O'Callaghan was a corporator, but it does not appear that he acted as manager until his re-election as such on April 25th, 1873. From that date he continued to be a manager until the bank suspended in 1878. He was a member of the executive committee from November 19th, 1877, till November 11th, 1878, and about the time the bank closed he was elected president in the place of John Halliard.

Charles W. Perveil was a corporator and was also a manager from June 8th, 1869, until November 17th, 1873. He was a member of the finance committee from June 8th, 1869, to November 14th, 1870, and of the executive committee from November 14th, 1870, to November 17th, 1873.

James J. Reid was a manager from November 20th, 1876, until the bank closed. He was also a clerk in the bank.

Patrick Reilly was a corporator and a manager from June 8th, 1869, until the bank closed. He was the bank's treasurer from December 3d, 1869, to November 18th, 1877.

Jeremiah Sweeney was elected a manager May 15th, 1871, and continued to be a manager until the bank closed. He was

a member of the executive committee from November 15th, 1875, until the suspension.

Robert Smyth was elected a manager on June 8th, 1869, and was re-elected under the supplement to the charter in May, 1871, and continued to be a manager until the bank suspended. He was a member of the executive committee from November 20th, 1871, to November 25th, 1872, and of the finance committee from November 19th, 1877, until the bank closed.

Francis Stoveken does not appear ever to have acted as manager or to have consented to the use of his name as such. The complainant does not ask for recovery against him.

Patrick Sheeran was a corporator and a manager throughout the bank's existence. He was also a member of the executive committee from November 14th, 1870, to November 25th, 1872, and again from November 20th, 1876, to November 11th, 1878.

The complainant, in the first place, seeks to recover for losses to the bank by reason of twenty-two investments upon inadequate landed security. At the outstart of the consideration of those investments it is important to settle what security the charter required for loans upon real estate. Its provision in this respect was—

"That said corporation shall invest no money * * * on bond and mortgage except on real estate worth at least double the amount of the sum invested above all encumbrances."

In *Williams* v. *McDonald*, *15 Stew. Eq. 392, 395,* this clause was construed by Justice Scudder, who there read the opinion of the court of errors and appeals. He said: " The words of the restriction are awkwardly expressed, but mean at least double the amount of the sum invested and double all encumbrances. The word 'above' signifies excess, and the word 'double' qualifies this excess, so that it may read 'double the investment and double the encumbrances.' This is an ordinary and approved estimate of real estate as security for loans."

The defendants appear to have put this construction upon the charter's restriction. Mr. Farrelly, speaking upon this subject, says that he understood that in such investments half the value

of the property was to be above the encumbrances, and nothing in the proofs indicates that any of the other managers entertained a different understanding.

It is next important to determine what duty devolved upon the managers with reference to loans by the bank. That duty was defined by Chief-Justice Beasley, in this case, when it was before the court of errors and appeals upon demurrer to the bill (*13 Stew. Eq. 195*), in these words : " The duty belonging to such a situation is a plain one—to care for the moneys intrusted to them in the manner provided in the charter, and to exercise ordinary care and prudence in so doing. * * * These defendants held themselves out to the public as the managers of this bank, and by so doing they severally engaged to carry it on in the same way that men of common prudence and skill conduct similar business for themselves." In short, the duty was to lend the bank's money, not only in the manner indicated and required by the charter, but also prudently ; the prudence required being measured by the character and objects of the institution.

It cannot be questioned that, in pursuance of their duty, it was proper for the managers to define the duties of the officers of the bank, and, to facilitate the transaction of business, appoint small committees from their number to superintend those officers and dispose of detail and routine work that could not readily be disposed of by the more numerous and unwieldy board of managers, for it would be almost impracticable for the managers, in a body, to attend to such matters. But it does not follow, because of the appointment of such officers and committees, that the managers, who were not charged with official duty, might relax vigilance and rely entirely upon officers and committees. A man of common prudence and skill in managing a similar business for himself would not be guilty of such unguarded confidence. He would from time to time acquaint himself with the manner in which such delegates were performing their duties, and with the practices which prevailed in the conduct of the business, so that he might determine whether the business methods were safe and proper. He might not look so

closely into the affairs of the business as to detect concealed and isolated instances of wrong-doing, but he would so familiarize himself with their workings that he would readily detect habitual looseness, carelessness and wrong-doing.

Upon this subject the chief-justice remarked : " The charter required the defendants to meet at least twice a year as a board of managers, and such regulation was almost entirely useless unless on such occasion it was their duty to supervise the conduct of their committees and to look generally into the affairs of the company. There is no ground for the belief that it was the intention of the legislature that none but such managers as acted upon committees should have charge of the affairs of the bank. The only guarantee given to depositors consisted in the reputation of its managers with respect to probity and fiscal ability, and such guarantee was a mere snare if more than two-thirds of such officers were to have no substantial part in the management. Doubtless such officers had the right to rely in many respects upon the skill and diligence of their committeemen, and if, exercising a reasonable circumspection, they were unaware of the misconduct or neglects of such agents, they would not be responsible for the consequences. But so plain was their duty to oversee the business done by such committeemen, that it seems to me they are chargeable *prima facie* with knowledge of what was doing or had been done in all important matters by such bodies."

It appears that almost all the loans upon real estate from which culpable losses resulted, were placed by and through the president, without consultation with either the finance committee or the board of managers. The grossly careless and improper manner in which the treasurer performed his duties, and the general indifference of the managers and their committees, enabled him to pursue this practice.

The by-laws provided, as has been seen, that all moneys received by the secretary should be placed by him in some depository, from which they should be drawn by check, signed by the treasurer and countersigned by the president or vice-president. It is evident that, under this arrangement, it would

Williams *v.* McKay.

be impossible to use the bank's moneys without the treasurer's consent, and that it was in his power to defeat any irregular or unlawful expenditure.

It is shown that it was the custom of Patrick Reilly, while he was the treasurer of the bank, to visit it once or twice a week and sign several sheets of blank checks in the check-book, and leave the book in the bank, so that the checks might be taken by the president according to his convenience. It was the president's custom to stop at the bank and take as many of those blank checks as he had occasion to use. At times he would have the assistant secretary fill a check out for him, making it payable to his order, or to the bearer, or to the order of some person to whom he intended to give the check. At times he would state the purpose for which he took a check, at other times he would promise to account for the use he would put it to, and at yet other times he would take it in blank without any explanation. The consequence of this practice was, that it was impossible to fill up the check-stubs or know, without going to the deposit bank, for what sums the checks had been drawn. As will be hereafter seen, the facilities thus afforded by the treasurer's dereliction of plain duty, resulted in the bank's ultimate ruin. A simple inspection of the check-book at any time by any of the managers, would have revealed checks signed in blank and numerous unfilled stubs, and, I think, would have led any reasonably careful man to an inquiry which would have disclosed the dangerous and intolerable condition of the bank's affairs.

The by-laws made it the special duty of the executive committee to take general charge of the bank and its books and securities, and I find no sufficient excuse, at any time, for its non-performance of that duty.

If this committee had performed its duty in this particular with ordinary care, the president's methods, and the treasurer's culpable infraction of ordinary business rules and precautions, would unquestionably have come to light.

Not only did this committee entirely neglect to examine the bank books, but its examination of the securities was a mere perfunctory performance of that duty. It was, habitually, a

mere comparison of a bundle of papers with a list of the securities supposed to be owned by the bank. Both the bundle and list were produced by the secretary. The examination consisted in checking the papers on the list as they were called off. No inquiry appears to have been made as to the character or value of the security. It was not noticed that there were bonds and mortgages among the papers that had been purchased by the bank but had been taken in the names of individuals who had not assigned them to the bank, and mortgages to which the bank had no title, and even fictitious mortgages put among the papers to account for missing moneys. The slightest excuse by the president seems to have satisfactorily accounted for the nonproduction of valuable negotiable securities, the names of which appeared upon the list.

The finance committee appears to have exhibited a similar indifference to the duty imposed upon it. At each meeting of the board of managers the lists of the securities of the bank showed new investments upon which the committee had never acted, yet it failed to assert its right to pass upon the investments, and to protest against the usurpation of its functions by the officers of the bank. The atmosphere was one of apathetic disregard of personal obligation and abject submission to the will of the president of the bank. There does not seem to have been the least inquiry into the propriety, honesty or legality of his methods until after it was discovered that the bank had been ruined.

Where a loss has resulted from dishonesty, disregard of the charter's requirements, or culpable negligence, all the defendants who are chargeable with such faults must be held alike responsible, so far as the receiver is concerned, without reference to the degree of dereliction, but, as between themselves, there may be grades of liability according to the degrees of culpability. In *Lewin on Trusts 909*, it is said :

"Though as respects the remedy of the *cestui que trust* each trustee is individually responsible for the whole amount of the loss, whether he was principal in the breach of trust or was merely a consenting party, yet, as between the trustees themselves, the loss may be thrown upon the party on whom as recipient of the money or otherwise the responsibility ought in equity to fall, or if he be dead upon his estate."

In considering the various items of loss for which the defendants are liable, I have taken into consideration the equities which appear to exist between them as the case is presented, with the view of suggesting the order of their liability, although I fear that my action in this respect cannot be justified under the pleadings as they stand.

It has become apparent to me that, in this case, there are five grades of culpability. In the first grade I include those managers who were concerned in, and who profited by, an unlawful, imprudent or negligent transaction that resulted in a loss; in the second, those who, though concerned in such a transaction, did not profit by it; in the third, those who, though they did not know of the transaction which occasioned the loss, by negligent and improper discharge of some duty specially imposed upon them, made such loss possible; in the fourth, those who, though they did not know of the transaction which occasioned the loss, negligently omitted to perform a duty specially charged upon them, the proper performance of which would have prevented the loss; and in the fifth, those who, though not charged by the by-laws with any special duty, failed to exercise that reasonable circumspection over the affairs of the bank which the law demands of them.

While the charter did not prohibit loans upon second mortgage, and therefore, upon the ground of illegality, such loans cannot be condemned, yet each investment of that character, as other investments, must be subjected to the inquiry, whether it was such as an ordinarily prudent man would have accepted for himself, and an important element in the consideration that leads to the condemnation of such an investment may be that its security was impaired by large prior encumbrances. It can readily be perceived that the investment of a small sum upon the security of a mortgage which is second to a mortgage securing the payment of a very large amount, would be imprudent, on the ground that, in the protection of the small investment, the investor would be obliged to stand perpetually ready to buy or pay the larger mortgage. The subjection of a savings bank to liability to calls of this character cannot be deemed wise as a general practice, and may be grossly imprudent in particular instances.

The first real estate loan complained of was $1,120, made to Patrick Hyland on February 3d, 1870. The security was a house and two lots in Jersey City fairly worth $4,500, and already encumbered by a mortgage for $2,700, which was also a lien upon two other lots worth $1,500. The mortgagor was married, but his wife was not required to join in the mortgage. The mortgage was made to the defendant Fitzpatrick, and was by him afterwards, in 1878, assigned to the bank. It appears upon the bank's books in March, 1870, but it does not appear to have been submitted to or approved by the finance committee. A check for a portion of the money loaned, payable to the order of Patrick Hyland, signed by Patrick Reilly as treasurer and John Halliard as president, and endorsed by Patrick Hyland, whose endorsement is certified to be correct by David Hallanan, secretary of the bank, in the absence of explanation, proves that the loan was made by three officers of the bank. The loan was clearly not within the restriction of the charter. The property mortgaged was ultimately · sold under foreclosure of the first mortgage, and the proceeds of sale were not sufficient to pay the amount due to the first mortgagee. The entire amount loaned, with interest from May 1st, 1878, was lost. The defendants, John Halliard and the executors of Patrick Reilly, must answer for this loss.

The defendant Fitzpatrick swears that he did not know that the mortgage was taken in his name. From 1870 to the close of the bank the mortgage was repeatedly examined by the executive committee, and, indeed, more than once by the executive committee of which Fitzpatrick himself was a member, and the fact that it was in the name of Fitzpatrick, and was not assigned by him to the bank, seems to have escaped their attention.

By assignment from John Winkler, on February 21st, 1871, the bank took a mortgage for $250 upon a vacant lot in the salt meadow west of Hoboken. It is abundantly shown that the lot was not worth the amount loaned upon it. There is no pretence that the finance committee acted upon the loan. The mortgage appears upon the books of the bank and among its

assets from February 21st, 1871. It was paid for by checks signed by the treasurer, Reilly, and countersigned by the president, Halliard. It was foreclosed, and the mortgaged premises were bought in by the bank at foreclosure sale, in October, 1876. The cost of the foreclosure, which amounted to $182.41, was paid by the bank. The lot was sold at public auction, in 1884, by the receiver, for $10. The loss to the bank is $250, with interest from November 1st, 1874, and the cost of the foreclosure, with interest from October 1st, 1876, less the $10 realized by the receiver.

John Halliard and the executors of Patrick Reilly are primarily liable for this loss.

On January 20th, 1871, Arthur H. Dundon and his wife mortgaged to the bank a single lot, which Mr. Dundon had purchased six months before for $2,800, to secure a loan of $750. The lot was then encumbered by a mortgage for $2,080. The evidence shows that when the loan was made $2,800 was in excess of the fair value of the mortgaged premises. The two mortgages added together appear to amount to more than the value of the mortgaged premises. The loan, then, was clearly in violation of the charter. But it is claimed that when the mortgage was given Mr. Dundon verbally promised to use the bank's money in building upon the lot, and he did, in fact, afterwards build upon the lot at a cost of $3,000 or more. This promise did not excuse a violation of the charter, although its subsequent performance may possibly, according to the ideas of values which then prevailed, have given the bank the security which it should have had when the loan was made. Putting this loan, however, to the test, whether a man of ordinary business prudence would have made it for himself, I think it must fail. I cannot conceive that such a business man, who desired to make a permanent investment, would make a small loan of $750 subject to a first mortgage of $2,080, especially where the value of the mortgaged premises was scarcely double the amount of the encumbrances. Upon the slightest consideration, he would see that, to protect it, he must be prepared at any time to pay three times its amount. Eventually, in this instance, the first mort-

gage was foreclosed and the property sold, and so little was realized by the sale that the bank's loan was entirely lost. Interest was paid to November 1st, 1877. The loan was made by the defendant Halliard, and was not submitted to the finance committee. The treasurer, Reilly, gave a check for the amount of it. The mortgage appeared among the assets of the bank from March, 1871. The defendant Halliard is primarily liable for this loss, and the executors of Reilly are secondarily liable.

On July 14th, 1871, the bank took from Betsey Robertshaw an assignment of a mortgage for $1,000, made to her by John Heslin and wife. It was a second mortgage on a lot on Newark avenue, in Jersey City, worth $2,500. The first mortgage covered this property and two other lots, and those two other lots were encumbered by a mortgage of $1,900, which was prior to the $2,500 mortgage. Those lots, with their improvements, were worth about $8,000. The encumbrance upon the lot mortgaged to the bank, including the bank's mortgage, thus amounted to $3,500, or $1,000 more than the lot was worth. The loan, then, was clearly in excess of the charter's requirement. But it is urged that payment of the $2,500 mortgage was amply secured by the other property, upon which it was a lien, which would be first sold to pay it. Upon that other property, as has been seen, it was second to a $1,900 mortgage. In order to protect itself, the bank would have to see that, upon the sale of the outside property covered by the $2,500 mortgage, enough should be realized to pay, first, the $1,900 mortgage, and then a very considerable portion of the $2,500 mortgage, and, after that, to see that enough should be realized upon the sale of the lot mortgaged to the bank to pay both the remainder of the $2,500 mortgage and the bank's own mortgage. The bank was not a necessary party to a suit for the foreclosure of the $1,900 mortgage, and it was not entitled to notice of such foreclosure; consequently, under that mortgage, the two outside lots might be sold without its knowledge. It could avoid such a catastrophe only by constant inquiry. It does not appear how such a complicated and dangerous investment could be considered ordinarily prudent. On December 20th, 1872, $250 was paid on account of the

bank's mortgage. Subsequently the bank foreclosed, and, at the foreclosure sale, bought in the Newark avenue lot subject to the $2,500 mortgage. In 1875 the $2,500 mortgage was foreclosed, and all that it covered, including the bank's lot, was bought in by the bank, in the name of its attorney, for $3,310. Afterwards the properties purchased were sold under direction from the defendant Halliard. With reference to this loan, an account must be taken of the bank's receipts and disbursements; and if, upon such accounting, it shall appear that there was a loss, it must fall primarily upon Mr. Halliard and the executors of Patrick Reilly, for they appear to have paid out the money loaned, without the approval of the finance committee. The mortgage appears among the bank's assets after August 19th, 1871.

The loan next objected to, which was to one Waltman, is shown to have been a prudent and lawful one.

On October 1st, 1871, Patrick E. O'Brien borrowed from the bank $2,000 on mortgage upon property worth $4,500, which was already encumbered by a mortgage for $1,600. The property was subsequently sold, under foreclosure of the first mortgage, for less than the amount due upon that mortgage, and, consequently, the bank's loan, with interest from November 1st, 1875, was lost. It is clear that the loan was unlawful. The counsel for the defendants claim that it was unlawful only to the extent of the amount of the loan in excess of $650, because the first mortgage and $650 were equal to half the value of the mortgaged premises. The obvious answer to this contention is, that the loan was an entirety, and, as an entirety, was unlawful. The unlawfulness permeates every part of it. If the bank's loan had been only $650 the owner might have been able to save his property. The excess over $650, by reason of its amount, may have ensured the loss of the whole by discouraging the owner. The mortgage appears among the assets of the bank after October 1st, 1871. The money for it was obtained by means of a check to the order of the defendant Halliard, signed by him and the treasurer, Reilly. The fair inference is, that Halliard made the loan and that Reilly permitted him to take the money for the purpose. Halliard is primarily, and Reilly secondarily, liable.

On May 1st, 1872, Arthur H. Dundon and his wife mortgaged to the bank a lot on Grand street, Jersey City, which Dundon had purchased less than a year and a half before for $2,300, to secure a loan of $1,200. The lots were then encumbered by a first mortgage of $4,724, which covered this and two other lots. At the time he purchased, Mr. Dundon agreed with his grantor that he would pay $2,040 of the $4,724 mortgage, but it does not appear that the holder of the mortgage was party to that arrangement. The Dundon lot, then, was bound to pay at least $2,040 of the first mortgage in any event, and it might possibly be held for a much larger portion of it. The price paid for the lot by Dundon was its full value. Taking the first mortgage at $2,040, and the bank's loan at $1,200, and the value of the lot at $3,300, the loan was clearly unlawful. But it is shown that Dundon promised to build upon this lot, and that he did, in fact, build at a cost of about $3,000. If the value should be taken at $6,300, because of this building, the encumbrances would, even then, be in excess of half the value of the mortgaged premises. But, in addition to its unlawfulness, the loan was not prudent. It was a small sum subject to a much larger one. In the event of the borrower's failure, the bank would have to guard against the entire $4,724 mortgage, and possibly pay it, and certainly pay the $2,040 and its accumulation of interest. This mortgage became a part of the bank's assets on May 27th, 1872. The evidence shows that Reilly, the treasurer, signed a check for $600 of the money thus loaned; the balance is not traced by check, for the treasurer's method of doing business made that impossible. The loan, with interest from November 1st, 1877, was entirely lost. The defendant Halliard, who placed the loans, should be held primarily liable for the loss, and the defendant Reilly, to the extent of $600 and interest, secondarily liable. It is probable that the remaining $600 of this loan was paid by one of the checks which were signed in blank by Reilly, but the fact is not proven. It may be possible that the money was taken from the money-drawer in the savings bank without the knowledge of the treasurer.

On February 23d, 1872, Matthew T. Maloney assigned to the bank a mortgage for $500 on a lot on West Newark avenue. He had sold the lot to Bernard McGuigan in August, 1871, for $3,000, subject to a $2,000 mortgage. McGuigan paid $500 in cash, and gave the $500 mortgage, which was assigned to the bank. The $3,000 thus paid was the full value of the property. The loan taken by the bank, then, was clearly unlawful. It was also a small loan subject to a lien four times its amount, and was, therefore, careless and imprudent. In June, 1875, the property was sold in proceedings for the foreclosure of the first mortgage and bought in by the first mortgagee. A month later the bank bought the mortgaged premises in the name of David M. Neely, a nephew of the defendant Halliard, who held it in secret trust until after the bank closed in 1878, and then conveyed it to the bank. The receiver collected the rents to April, 1883, when he sold the property at public auction for $1,710. The purchase of this property for the bank was not lawful. It was not needed for the purpose of the bank's business, and the price paid for it, $2,500, subject to accumulated taxes, was its full value. I do not doubt that the bank, in a proper case, might buy at foreclosure sale to protect a lawful loan, but to buy at a high price to protect an unlawful loan I think partakes of the character of the loan, and is unlawful. But in this case the purchase was reckless as well as unlawful, for there could have been little, if any, expectation of realizing anything out of the property. The expenditure of $2,500 for a bare chance of saving $500 theretofore unlawfully loaned, is indefensible. The recovery in this matter must be the $500 originally loaned, with interest, and $2,500 subsequently paid for the property, with interest. An account must be taken of the receipts and disbursements on account of this property, by both the bank and its receiver, and whatever shall be found to the credit of the investment must be deducted from the recovery above mentioned.

On July 31st, 1872, $2,685 were paid for two lots on the corner of Grand and Sherman streets, in Jersey City, subject to a $700 mortgage. On February 28th, 1873, this mortgage, with interest, was paid, making the entire investment in these

lots $3,427.27. The deed of the lots was made to John Halliard, in secret trust for the bank. The lots appear upon the bank's books as its property from the date of the purchase. While Halliard held the title a judgment was recovered against him, and under it the property was sold. In March, 1879, after the bank had failed, Halliard made a deed of the property to it. Subsequently the receiver sued to establish the trust for the bank. In the meanwhile, the taxes upon the property were suffered to remain unpaid, and liens for them accumulated to a considerable amount. Finally, in May, 1880, the receiver, with the approval of the chancellor, compromised his suit and gave up all claim to the property upon being paid $300. The charter authorizes the acquirement of property necessary for the business of the bank, but there was no pretence that these lots were needed for that purpose. The defendant Fitzpatrick thought that it might be expedient to buy them, so that some time in the future a branch office might be established upon them, and the defendant Halliard appears to have agreed with him. It has not been shown that other managers were consulted about the purchase, or that the matter was submitted either to the finance committee or to the board of managers. The purchase was a pure speculation, and entirely unauthorized. The testimony discloses that after the lots had been bought and paid for, the treasurer, Reilly, vigorously denounced the transaction. It had, however, been consummated by means of the checks that he had signed in blank. If he had performed the duties he assumed to perform when he took the treasurership, with ordinary business-like care, the lots would never have been purchased. The defendants Fitzpatrick and Halliard are primarily liable for this loss, and the executors of Reilly secondarily liable.

The testimony as to values in the matter of the Garrison and Bergee loans is so conflicting that I cannot say that fair discretion and judgment were not exercised in valuing the property when the loans were made. I cannot, therefore, hold that this investment was either unlawful or imprudent.

On November 8th, 1872, Henry Osborn assigned to the bank a second mortgage for $2,500 on property belonging to Jeremiah

F. O'Sullivan. The first mortgage on the property was for $8,000. The mortgaged premises consisted of two lots on the corner of Grove and Twelfth streets, in Jersey City, upon which a four-story brick building had been erected. When the bank's loan was made the property was not fairly worth more than $15,000 or $16,000. The loan was, then, not a lawful one, nor do I think it can be considered to have been an ordinarily prudent one, for I cannot conceive it to be prudent to lend $2,500 subject to an $8,000 lien, and thus put the bank to the necessity of standing perpetually ready to pay $8,000. The mortgage appeared among the assets of the bank from the time it was taken. The property was ultimately sold under foreclosure of the first mortgage, and the bank's loan, with interest from May 1st, 1878, was lost. It does not appear that this investment was submitted to the finance committee. The evidence shows that the payments for it were made by checks signed by the treasurer, Reilly, through the defendant Halliard. Halliard is primarily liable, and the executors of Reilly secondarily liable.

On December 1st, 1872, a loan for $1,200 was made to Richard H. L. Tighe, upon a house and lot upon Fifth street and three lots on West Newark avenue, in Jersey City. The property on Fifth street was already encumbered by a mortgage for $3,625, and the lots on West Newark avenue had upon them two mortgages of $2,000 each. The value of the whole property was a little over $9,000. The loan was, then, $1,200, subject to prior mortgages aggregating in amount $7,625 upon property worth $9,000. This was clearly unlawful and grossly reckless. The mortgaged premises were sold under the prior mortgage, and the bank lost the entire amount it had loaned, with interest from November 1st, 1875. It does not appear that this loan was authorized by the finance committee. It was made by the defendant Halliard, he obtaining the money by means of the blank checks signed by Reilly. The mortgage was among the assets of the bank from December, 1872. Halliard is primarily liable for the loss, and the estate of Reilly secondarily liable.

On April 19th, 1873, John McAnally borrowed from the bank

$1,000 upon mortgage on real estate worth $4,000, which, with other property, was subject to a first mortgage for $14,000. The whole property covered by this $14,000 mortgage was worth $20,000. It is apparent that the bank, to be secure, had always to be prepared to protect itself against the $14,000 mortgage. The mortgaged premises were ultimately sold under a foreclosure of the first mortgage, $1,247.28 being decreed to be the amount of the lien of that mortgage upon the lot mortgaged to the bank, and the bank's loan, with interest from November 1st, 1875, was entirely lost. It seems to me to be plain that the loan was not only unlawful, but also unsafe and imprudent. It was not presented to the finance committee. It does not appear who negotiated it. Reilly's executors are primarily liable because he allowed the money to go out of the treasury to pay for it.

It has not been shown that the Ann Welsh loan was an unlawful or imprudent one.

The receiver has abandoned his claim under the John Dooley loan.

On August 5th, 1872, Martin Doyle made a second mortgage for $200 to the defendant John Halliard upon a lot in Mercer street, in Jersey City. The lot was then encumbered by a prior mortgage for $600, and was fairly worth $900. The mortgage appears by the books of the bank to have been among its assets in 1873. In 1875 the property was sold under foreclosure of the first mortgage, and was bought in by the bank for $850, which was about the amount of the decree for the complainant in that foreclosure suit, together with the sheriff's execution fees. In 1884 the premises were sold by the receiver at public auction and brought only $35. It is manifest that this transaction, for reasons that I have stated in remarks upon other loans, was both unlawful and grossly imprudent. The defendants' counsel term it "indefensible." The expenditures were not authorized by the finance committee, and seem to have been made entirely by the defendant Halliard by means of checks that the treasurer, Reilly, negligently placed at his disposal. Hal-

liard is primarily liable for the losses here, and the estate of Reilly secondarily liable.

On February 1st, 1875, three mortgages, aggregating in amount $10,000, on five houses and lots on Henry street, in Jersey City, were made to the bank. The property was then subject to a mortgage of $10,000, and was worth only $20,000. It really belonged to the defendant Halliard, but the title stood in the name of his nephew David M. Neely. All the actual cash that Halliard obtained by this transaction was $2,688.22. It appears that $20,000 of the bank's money was supposed to be invested in United States bonds, which were in Halliard's possession. Halliard thought best to account for some interest upon the supposed bonds, and instead of demanding cash for the whole of the $10,000 nominated in the Neely mortgages, took credit for $3,666.67, interest paid upon the United States bonds. He also was then indebted to the bank in the sum of $4,045.11 upon his own promissory note, and he took up that note, giving credit to the amount of it on the Neely mortgage. These items left $2,688.22 of the $10,000 unpaid, and for that sum Mr. Halliard took credit in his deposit account in the bank, and subsequently drew the money. The mortgaged premises were sold under foreclosure of the first mortgage, and the bank got nothing for its mortgage. The loan does not appear to have been presented to the finance committee for its approval. The only loss occasioned by this mortgage was the $2,688.22 passed to Halliard's credit: The amount credited Halliard for interest on United States bonds was a pure fiction. It could not be that any such amount of interest would be paid on $20,000 worth of United States bonds. Interest on the amount of the bonds would not come out in odd dollars and cents. Such a credit appearing upon the books of the bank must have been most significant to the most careless and inexperienced observer. It seems to me that no ordinarily careful manager of a bank could have seen it without being put at once upon inquiry why the interest upon the United States bonds was thus cut up and paid, not by the government, but by John Halliard. But I shall treat of the United States bonds hereafter. So, also, the $4,045.11, used

to take up John Halliard's note, was not a loss to the bank upon bond and mortgage. I shall have occasion to treat of this note when I reach the subject of loans upon personal security. John Halliard is primarily liable for the loss of the $2,688.22. The assistant secretary, Donelan, knew of the transaction, but was not then a manager. It does not appear that any of the remaining defendants noticed the loan.

On October 1st, 1871, Adam J. Dittmar, who was then one of the managers of the bank, borrowed $1,500 upon mortgage on five lots on Montgomery street, in Jersey City. The lots were abundant security for the loan, but on December 20th, 1871, Dittmar procured Halliard to execute a release of one of the lots from the mortgage, and on April 16th, 1875, procured from him a further release of two more of the lots. These two releases reduced the value of the bank's security below that which was lawful under the charter. The owner of the remaining lots ultimately conveyed them to the receiver of the bank, and in 1874 the receiver sold the property at public sale for $1,080. The releases that were executed in this instance were not authorized by the board of managers, and, so far as the proofs go, none of the defendants save Halliard and Dittmar knew of them. The acts were isolated, and I cannot see how, by the exercise of ordinary prudence, other managers could have prevented them. When the releases were executed, I think the loan must be considered as having been made anew by Halliard and Dittmar, and they alone must be held liable for the loss. The proofs do not show what the loss is, and an account must therefore be taken to ascertain it.

On June 2d, 1875, $4,000 of the bank's moneys were invested in a third mortgage upon some real estate situate on the corner of Warren street and Railroad avenue, in Jersey City. The mortgagor purchased the property for its fair value on the day before the mortgage was made to the bank. On the day that the property was bought, its purchaser, Michael Murphy, mortgaged it for $9,000 to one Southard, and for $2,000 to one Mundell, and thus the bank's mortgage was subject to prior encumbrances amounting to $11,000. The mortgage was taken

by Owen T. W. McDonald, who was then one of the managers and a member of the finance committee, in his own name, and assigned by him to the bank. On June 21st, 1875, $1,000 was paid upon the mortgage. In 1879 the property was sold under a foreclosure of one of the prior mortgages, and that part of the bank's investment which remained unpaid was entirely lost. After the failure of the bank, its receiver brought suit against McDonald to compel him to indemnify the bank against its loss upon this investment, and a decree was made against him. *Williams* v. *McDonald, 10 Stew. Eq. 409; S. C. on appeal, 15 Stew. Eq. 392.* The evidence and record in that case are, by agreement, used in this suit. The purpose now is to establish the liability, if any, of the defendants in this suit, other than McDonald. The testimony shows that the defendant Halliard actively participated in putting this loan upon the bank. It was never presented to the finance committee. McDonald and Halliard appear to have transacted the entire business, and they are, consequently, primarily liable for the loss. The defendant Donelan was then secretary and a manager of the bank, he having been elected a manager on the 17th day of May, 1875. He appears to have been cognizant of the transaction and to have known that it was being consummated irregularly and without reference to the finance committee. It is not shown that he knew that the loan was unlawful, or that the real estate upon which it was a lien was inadequate security, but his acquiescence in the irregular method of putting the mortgage in the bank enabled the negotiators to accomplish their purpose. More than this, Mr. Donelan then had possession of the checkbook in which the treasurer had signed sheets of checks in blank, and it was in his power to hold back those checks until the proposed loan could have been duly investigated. He allowed a check to be used and the money was paid by means of it. I think that he and the treasurer, Reilly, were at fault for their negligence in this transaction, and that they should be held secondarily liable for the loss to the bank. The evidence does not satisfy me that the Nicholson and Forbes loans were either unlawful or grossly imprudent.

The history of these investments discloses that they were all placed either directly by Mr. Halliard or through his intervention.

In several of them managers were concerned sufficiently to acquaint them with the president's methods. Dittmar was party to Mr. Halliard's reduction of a security, by releases, below the charter's requirements. McDonald assisted in investing $4,000 in defiance of all prudence and law, and Fitzpatrick was party to an indefensible speculation in vacant lots. Reilly protested against this speculation, but, nevertheless, continued to sign checks in blank and place them at Mr. Halliard's disposal. The assistant secretary, Donelan, was cognizant of all the president's doings. The disregard of the charter and by-laws was not an isolated instance, but was habitually and continuously persevered in. It does not seem to me to have been possible for any manager to have exercised ordinary vigilance without discovering this course of misconduct and its danger to the bank. The conclusion, then, is irresistible, that the managers either purposely or negligently refrained from interference with the practices pursued, or were not ordinarily vigilant. In either case they must be held responsible for the losses.

I have already designated the individuals who, as between themselves, are primarily responsible for each loss in landed investment because of their personal connection with it or their careless and negligent discharge of special trusts reposed in them. It remains to determine the responsibility of those who are culpable solely upon the ground that they omitted the performance of duties expressly or impliedly incumbent upon them, and among these managers I include committeemen who were expressly charged by the by-laws with the duty of investigating the affairs of the bank, and the whole body of trustees, who were bound to reasonable vigilance. Of these persons, those who were specially charged by the by-laws with the duty of maintaining a watchful supervision of the affairs of the bank, should, as I have already intimated, be held primarily liable.

I do not hold either of these classes responsible for the Hyland loan, because I think that it could not have been anticipated. In

point of time it preceded the other loans a year or more, and inaugurated the systematic disregard of the charter and by-laws which has been commented upon. After it was made the disposition of the officers of the bank became manifest, and prompt measures should have been taken to make a recurrence of unlawful investment impossible.

For each of the loans that followed this one, I think all the defendants who were managers of the bank at the time they were respectively made should be held liable, the primary responsibility, as between those who were not individually concerned in it, resting with the members of the executive committee, who were expressly charged with the general supervision of the bank and the examination of its books, accounts and securities.

When the Dundon loan for $750 and the Winkler loan were made, the defendants Bevans, Carroll, Fitzpatrick, Halliard, Keary, McBride, Perveil, Reilly and Sheeran were managers, and Perveil and Sheeran were members of the executive committee.

When the Heslin and O'Brien loans were made, the situation was unchanged, except that the defendants Dittmar, McGuigan, Meehan, Miller, Smyth, Farrelly, Monks and Sweeney had become managers.

When the Dundon loan for $1,200 and the McGuigan loan were made, the same managers remained in office, and Fitzpatrick, Perveil and Sheeran composed the executive committee.

When the Grand street lots were purchased and the Doyle and O'Sullivan loans were made, the last-stated situation was unchanged, except that the defendant Murphy had become a manager.

When the Tighe mortgage was made, the defendant McKay had become a manager, and the defendants McKay, Perveil and Smyth had become members of the executive committee, in the place of Fitzpatrick, Perveil and Sheeran; otherwise the situation was unchanged. At the time of this loan, however, Mr. McKay had just joined the bank, and was not yet in a situation to be able to prevent this loan, and should not be held responsible for it.

When the Murphy loan was made, in June, 1875, the defendants Bevans, Brock, Carroll, Dittmar, Donelan, Halliard, Keary, Kelly, McBride, McKay, Meehan, Miller, Monks, Murphy, McDonald, O'Callaghan, Reilly, Sweeney, Smyth and Sheeran were managers, and the defendants Carroll, Keary and Meehan constituted the executive committee. It is to be remembered that the president and vice-president were *ex officio* members of the executive and finance committees. Where those committees are held liable these officers must be included among their members.

During the summer of 1869 the practice of lending moneys of the bank upon mere personal security was inaugurated. In August the sums loaned in this way amounted to $550. At the end of the year they had increased to $3,602.26, and thereafter they further increased, so that in December, 1870, they reached $17,970, and at one time, in 1871, they aggregated more than $30,000.

Until January, 1872, all these loans were made from savings deposits. In that month the bank commenced to take what were called special deposits, which were distinguished from the savings deposits in that they were payable without interest and by check, while the savings depositor was entitled to interest (or dividend), and could be required to give thirty days' previous notice of any draft he might desire to make, and he was also obliged, as a rule, to produce his individual account-book when he drew money.

The special deposits so increased during the year 1872 that at the end of October they amounted to $15,079.62. At the same time the discounting and buying of commercial paper also increased to such extent that, at the end of the same month, $51,710.59 of the bank's money was invested in it. Thereafter to the close of the bank, in 1873, the special deposits were rarely greater than the sums thus invested. The bank's books show that they averaged from $10,000 to $15,000 less.

Many of these discounts, or purchases of commercial paper, have resulted in losses to the bank, for which the receiver seeks to hold the defendants liable.

His position is, that such loans were not only unlawful, but also imprudent.

It has been determined in this case that the investment of the funds of this bank upon personal security merely, was prohibited by the charter. *Williams* v. *McKay, 13 Stew. Eq. 189, 200.*

The attitudes of the several defendants, as they seek to avoid responsibility for the losses incurred by these unlawful loans, divide them into three classes.

One class alleges that it did not know that any investments were being made in commercial paper. Another class insists that, in good faith, it believed that the special deposits might be used in buying and discounting paper, and denies that it knew that the moneys thus used ever exceeded the special deposits, and the third class asserts that, in good faith, it believed, erroneously it is true, that the charter did not prohibit loans upon mere personal security.

Trustees of the character of the defendants are not merely required to be honest, but they must also bring to the discharge of the duties that they undertake ordinary competency, together with reasonable vigilance and care. They cannot excuse imprudence or indifference by showing honesty of intention coupled with gross ignorance and inexperience, or coupled with an absorption of their time and attention in their private affairs. The rule in this respect is admirably stated by Judge Earl of the court of appeals of New York in *Hun* v. *Cary, 82 N. Y. 74,* in this language: "One who voluntarily takes the position of director and invites confidence in that relation, undertakes, like a mandatory, with those whom he represents or for whom he acts, that he possesses at least ordinary knowledge and skill, and that he will bring them to bear in the discharge of his duties. Such is the rule applicable to public officers, to professional men, and to mechanics, and such is the rule which must be applicable to every person who undertakes to act for another in a situation or employment requiring skill and knowledge gratuitously. These defendants ordinarily took the position of trustees of the bank. They invited depositors to confide to them their savings and to

entrust the safe-keeping and management of them to their skill and prudence. They undertook not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust."

The mere statement of the sums of money invested in commercial paper satisfactorily shows that the practice of making such investments was one of the principal occupations of the bank. For a manager to assert a want of knowledge of such practice, is to admit an unpardonable neglect to exercise the care and vigilance that the law requires of him, for it is plain that the slightest examination into the dealings of the institution would have disclosed it. One of the managers who denies knowledge of these investments is the defendant Sweeney, who claims not only that his time was occupied in his business as superintendent of freight handlers employed by the Erie Railway Company, but also that he was not competent to understand the business of the bank. Another is Thomas C. O'Callaghan, a successful physician, who shows that he was too much absorbed in his professional pursuits to give the affairs of the bank his attention. Patrick Kelly is in a position similar to that of Mr. Sweeney. He was a market-gardener, who devoted his entire time to his own business, having very little regard to the bank's. He attended the semi-annual meetings of the managers, and was contented, without the slightest investigation, to accept as true all statements that were made to him or laid before him. The defendant Murphy was a builder, so occupied with his own affairs that he entirely neglected his duties to the bank. He built sixty or more houses for the treasurer, Reilly, and erected several buildings for the defendant Halliard, and naturally was not disposed to lack confidence in them. The defendant Meehan asserts his utter incompetency, and in proof of it testifies that he cannot even read manuscript. Each of these defendants was so associated with wage-workers that his connection with the bank tended to induce the confidence of those people in that institution. Mr. Sweeney superintended five or six hundred freight handlers, Dr. O'Callaghan had a large practice among the very

people who became depositors in this bank, and Kelly, Murphy and Meehan were employers of numerous workingmen. They each undertook to care for the deposits of these poor people, and they cannot now say that they did not have the time or possess the ability to perform those duties as a man of ordinary care, vigilance and competency, in like business for himself, would have performed them. That these defendants were urged to take their position by the officers or other managers of the bank, and unwillingly assumed them, will not serve as an excuse, for the fact remains that they did take the position and did assume its duties and responsibilities, and that the depositors knew nothing of their unwillingness, but regarded them as successful, capable men, holding themselves out as willing to safely and prudently care for and manage the savings of the industrious. These defendants offer no sufficient excuse, and there can be no escape from the conclusion that they must be held liable for all losses that unlawful investments upon personal security occasioned.

The distinction between the second and third of the classes of the defendants in this connection is, that the second class are claimed to have made a mistake in believing that the investments of special deposits were not restricted by the charter in the same manner that the investments of savings deposits were restricted, while the third class are claimed to have been mistaken in that they believed that the charter did not forbid the investment of any and all funds upon mere personal security. The position of the second class admits that lending from the *savings deposits*, upon personal security, was deemed to be either unlawful or imprudent. In view of the language of the charter, it is difficult to perceive how it could have been thought that the deposits of one character should have less care or security than the deposits of another character. The charter expressly and plainly provided that " *all* " deposits of money should be treated in the same way, that is, improved, " according to the direction herein mentioned," and that dividends of profits should be made to depositors. I cannot find in the act the least justification for a departure from this plain requirement. The intention of the legislature, manifested in every part of the charter, is, that

the institution shall be a pure savings bank, and that *all deposits* of money in it, however they may be nominated, shall have the same safeguards in investment. The corporation is liable for all deposits, not only of any particular fund, but generally. Insecurity in the investment of special deposits, then, is, to their extent, insecurity of all the deposits in the bank. The proper reading of the charter in this connection is not a matter of nice construction, depending upon the meaning of vague and ambiguous terms, the ascertainment of which requires the skill of a specially trained mind. It is simply the meaning of plain words, which is within the comprehension and determination of every man of ordinary understanding.

The belief of the defendants of the second class, however, does not appear to have been founded upon a mistaken conception of the meaning of the charter, for not one of them testifies that he read the charter to ascertain the powers of the corporation with respect to discounting and special deposits. The belief apparently grew out of a mere rumor among them that the practice had been sanctioned by counsel. Such a belief is not an honest mistake of powers. It is inexcusable for a director not to read and know the provisions of the fundamental law controlling the bank. He can only be excused when, after taking due care to understand those provisions, he honestly mistakes them. I do not find any evidence of such a mistake here. Not only do the defendants of this class fail to show a misinterpretation of the charter, but many of them exhibit that they were not mistaken, but were merely in doubt as to the bank's powers. The doubt manifestly grew out of the glaring and gross impropriety of a savings bank conducting a deposit and discount business. This doubt itself put them upon inquiry, and two courses were then open to them—to examine the charter, or to have counsel examine it and advise them. Not one of them claims to have adopted the first course. The second course was thought of and a resolution was passed which directed the president to take advice upon the subject, but there the matter was suffered to rest, and the president neither obeyed nor was compelled to obey the requirements of the resolution. If these defendants did, subse-

quently, settle their doubts and arrive at the belief that discounting from special deposits was legal, it does not appear that such settlement of doubt was by a mistaken construction of the charter's powers.    To reach their belief through rumor or through the misstatements of others, with the charter before them unexamined, is unpardonable.    A belief thus reached is not an excusable mistake, but a careless, unjustifiable blunder. It is not always necessary to an excusable mistake as to the meaning of a law, that counsel shall have been consulted.    A mistaken interpretation of a charter's provisions may be adopted by a director without the least doubt as to its correctness, in which case nothing indicates the desirability of counsel's advice; but where there is uncertainty or doubt as to the propriety of the construction, proper care, I think, should require resort to skilled assistance.    An excusable mistake in the meaning of a law is one which occurs after all means of information that suggest themselves to a man of ordinary care and prudence have been exhausted.    *Hodges* v. *New England Screw Co., 1 R. I. 312.*

The third class of defendants do not appear to be more excusable than the second.    None of them profess that they misconstrued the charter.    I do not find in the testimony of a single defendant of this class, the statement that he read the charter with the view of determining whether it would permit loans upon mere personal security.    Their counsel argue that the language of the tenth section of the charter, which defines the character of the investments allowed to the bank, is awkward and obscure, and that its interpretation as prohibiting other than the enumerated investments, rests in an inference which the ordinary mind should not be expected to draw.    This criticism may be just, but the defendants have not professed an inability to draw the inference.    They have not said that they were misled by any obscurity in the charter's language.    They simply say, that they believed that they might invest upon mere personal security, without showing that that belief was the result of an honest and careful, but mistaken, construction of the charter.    The burden of showing an excusable mistake is upon them.    The mere fact that the prohibition is now found to be of such a character that

it might have misled them, will not protect them.    They should have shown, if they could, that they adopted an erroneous interpretation which satisfied them beyond reasonable doubt.    If there was doubt, ordinary care and prudence, as I have suggested, demanded the exhaustion of all readily available means of being correctly informed.    If we should admit that the provisions of the charter were examined, and that their language was misconstrued, I cannot, even then, believe that the defendants could have entered upon an extensive and systematic discount business without some misgivings and doubt.    Such a practice was foreign to the custom among institutions of the kind they managed, and, beyond all doubt, was not only imprudent, but reckless.    The object of a savings bank is stated by Judge Green, in *Hannon* v. *Williams, 7 Stew. Eq. 258,* to be " to receive and safely invest the savings of mechanics, laborers, servants, minors and others, thus affording to such persons the advantages of security and interest for their money, and in this way ameliorating the condition of the poor and laboring classes by engendering habits of industry and frugality."    The deposits of such an institution constitute its resources.    No capital, as in the case of a bank of deposit and discount, stands between the depositors and loss. The loss must fall directly upon the deposits, or upon the earnings of those deposits, to which the depositors are entitled.    The failure of a bank of this character entails suffering, produces distrust and discourages industry and frugality.    It would be most impolitic and unwise legislation that would permit a savings bank to lend upon precarious securities.    These considerations are in the minds of all men, and hence a discount business, conducted by a savings bank, without capital, is considered imprudent and dangerous, and is almost unheard of.    In view of this common knowledge and consideration, it appears to be improbable that the defendants could, even under a *bona fide* misunderstanding of the language of the charter, have entered upon this precarious business without misgivings that should have led to an inquiry that would have disclosed the true meaning of the law.

I am thus led to the conclusion, that the defendants must all be held responsible for the losses because of investments upon mere personal security which occurred while they were severally connected with the bank.

I cannot say that one is more responsible for them than another. The practice of making such loans was so systematic and so well known to the managers that they are all equally blamable for the losses which resulted from it—those who permitted it to continue equally with those who actively participated in it by approving loans or by bringing borrowers to the bank. It was as much in the power of the one as of the other to stop it.

The principal loss by loans upon mere personal security were moneys lent to John Van Vorst. Mr. Van Vorst was the owner of a large number of vacant lots, and about the time the bank was organized began to build upon them. His building operations were extensive. He miscalculated his financial ability, and, before long, his notes became common articles of merchandise throughout Jersey City. They were sold so that the purchaser could realize much more than the legal rate of interest. Generally they were promptly met, either with money payment or by a renewal, and were esteemed to be good. In April, 1870, the bank commenced to buy this paper. All negotiations concerning it were conducted by Mr. Halliard and Mr. Hallanan, at the office of the State Insurance Company, and until after his failure, in March, 1873, Mr. Van Vorst did not know that his notes had been taken for the savings bank. The notes, however, were regularly entered in the books of the bank, and appeared among the statements of securities semi-annually submitted to the managers. As they were believed to be good and were so discounted that they paid the bank twelve per cent. interest, they were freely taken. In May, 1872, the bank had $25,000 invested in the notes of this one man, each note being made payable three months after its date. After that date the notes were renewed from time to time until Mr. Van Vorst's failure. Shortly before his failure, Mr. Van Vorst borrowed $3,000 more; hence, when he failed, his entire indebtedness to the bank was $28,000. Soon after his failure $3,000 of his debt was paid.

Shortly after this payment was made he was requested by the defendant Donelan to give the bank a mortgage for the amount remaining due. This request for the first time apprised Mr. Van Vorst that the Mechanics and Laborers Savings Bank held the notes that Halliard and Hallanan had discounted for him. He told Mr. Donelan that he could give a second or third mortgage upon his homestead, but that it would be worthless. Mr. Donelan, however, persisted that the bank desired a mortgage, and it was accordingly given, and thereupon the entire Van Vorst debt was transferred, upon the books of the bank, from the "Bills Receivable" account to the "Bond and Mortgage" account, as of the date March 1st, 1873, which was previous to Mr. Van Vorst's failure. It is proved that the discounts were then largely in excess of the special deposits, and that the taking of this mortgage was a device, not only to hide the Van Vorst loss, but also to apparently reduce the loans upon mere personal security.

On November 10th, 1873, Mr. Van Vorst paid in cash $10,070.10 more on account of his indebtedness, and gave the bank two new notes, one for $15,000, and the other for $900. This transaction reduced his debt, and adjusted it and the interest on it to the transaction's date. Subsequently $460 was paid on account of the $900 note. Thus, the loss by reason of the loans upon the Van Vorst notes is reduced to $15,440, with interest from November 10th, 1873. Mr. Van Vorst is hopelessly insolvent.

The defendants Bevans, Carroll, Dittmar, Fitzpatrick, Halliard, Keary, McBride, McGuigan, Meehan, Miller, Perveil, Reilly, Smyth and Sheeran were managers throughout the entire period of time covered by the Van Vorst loans, and, for the reasons I have given, must be held to be liable for the loss they occasioned. Messrs. Dittmar, McGuigan, Meehan and Miller, it is true, were only *de facto* managers prior to May 15th, 1871, but all the loans antedating that time were either renewed after it or paid. These renewals occurred, in the case of each note, every three months, and, as the notes did not bear the same date and were for comparatively small amounts, the renewals were of

constant occurrence. At any time before the actual failure payment of the notes could have been required, and probably would have been made. There can be no reason, then, why these gentlemen should not be held to full liability.

The defendants Farrelly, Monks and Sweeney entered the bank as managers for the first time on May 15th, 1871. They were managers for nearly two years before the failure, and had ample time to realize the illegality of these loans and to have required payment of them.

I think that the defendant Murphy, who was elected a manager in May, 1872, also had abundant opportunity to prevent this loss, and that he should be held equally liable with the others.

The defendant McKay was elected a manager in November, 1872, and immediately took a place upon the executive committee, and thus was specially charged with the duty of investigating the business methods of the bank. All these notes were renewed after he went upon this committee, and $25,000 of them within a few weeks of his taking that position. He failed to make the least objection to the renewals or to the practice of lending upon personal security, and, I think, should be held equally liable with the other defendants mentioned.

The loan upon the note of J. R. Montgomery appears by the books of the bank to have been made on November 13th, 1871, for six months. The note was never either renewed or paid. It appears upon each semi-annual statement of bills receivable to have been checked by the executive committee as having been examined among the securities of the bank. None of the defendants knew who Montgomery was, and the defendant Donelan suggests that he may have been a myth, by which I understand him to intimate that the disappearance of some $2,000 was accounted for by a fictitious note, which, without question, was for six years passed by successive executive committees as a valid and valuable security. It can make very little difference, in effect, whether I consider the loss of the $2,000, with interest from May 13th, 1872, as moneys taken from the bank either in cash from the money-drawer, or by means of the blank checks

which the treasurer, Reilly, signed, or as moneys illegally loaned upon mere personal security, for in case it represents moneys abstracted from the bank, all the defendants would be liable for their gross negligence in permitting the loose practices which would admit of such abstraction ; and in case it represents a loan, they would be equally liable, because of the illegality and gross imprudence of the investment upon a mere personal note.   The only difference would be in adjusting the equities between the defendants, because, under the first-stated view, officers of the bank should be held to be primarily liable.   In absence, however, of proof that the note is a fiction, I must hold that it is what the books and statements of the bank show it to be, a loan. The defendants liable for this loan are Messrs. Bevans, Carroll, Dittmar, Fitzpatrick, Farrelly, Halliard, Keary, McBride, McGuigan, Meehan, Miller, Monks, Perveil, Reid, Reilly, Sweeney, Smyth and Sheeran.

In October, 1869, the bank loaned $2,200 to Charles Gobisch upon his note, and subsequently made him similar loans till his indebtedness reached $4,300.   In the latter part of 1872 he appears to have desired a further loan, and, upon the receipt of $1,320, assigned the bank the mortgage for $5,620, to which reference has heretofore been made,   After careful scrutiny of this transaction, I am satisfied that the loss must be considered as one upon bond and mortgage investment.   The loans upon the notes were illegal and imprudent, but they were subsequently merged in the mortgage which I have already commented upon. That mortgage was evidently taken in good faith as an investment, and not, like the Van Vorst mortgage, merely as a cloak to cover illegal transactions.

On May 31st, 1870, Severin T. Bruin borrowed from the bank $117 on his note, dated June 3d, 1870, and payable in one year. On February 28th, 1871, he paid $60 on account of the note. The balance, $57, with interest from June 3d, 1871, is unpaid. Recovery cannot be had from Bruin.   The defendants liable for this loss are Bevans, Carroll, Fitzpatrick, Halliard, Keary, McBride, Perveil, Reilly and Sheeran.

On January 6th, 1871, Charles W. Perveil, one of the managers of the bank and a defendant here, borrowed $50 upon his due-bill. He is insolvent. The loss is $50, with interest from January 6th, 1871. Perveil is primarily, and the defendants last mentioned are secondarily, liable for this loss.

On June 1st, 1871, Richard McAghan borrowed $120 from the bank upon his note, payable in six months. No recovery can be had from him. The loss to the bank is $120, with interest from December 1st, 1871.

The defendants liable, upon the principles stated, are Messrs. Bevans, Carroll, Dittmar, Fitzpatrick, Farrelly, Halliard, Keary, Meehan, McBride, McGuigan, Monks, Perveil, Reilly, Sweeney, Smyth and Sheeran.

Joseph Harford borrowed $300 upon his note, dated June 24th, 1872, and payable in thirty days. On July 22d, 1872, he paid $100 on account of the note, and at a later date paid $10 on account of interest. No recovery can be had from him. The loss is $200, with interest from July 24th, 1872, less $10 paid on account of the interest. The defendants liable are those who were last named and the defendant Murphy.

On December 3d, 1872, John McGuigan, who was then one of the managers of the bank, and is one of the defendants in this suit, renewed a note for $800 to the bank, making it payable in three months. Mr. McGuigan was then solvent. Nothing was ever paid upon this debt, and no part of it can be recovered. The defendants liable for this loan are, first, the defendant John McGuigan, and then the defendants who were last referred to.

On October 15th, 1873, $75 was loaned to William E. Sackett upon his note, payable in four days after date. No part of either the principal or interest of this loan can be recovered. The loss is $75, with interest from October 15th, 1873. The defendants liable for this loan are those who were last referred to, and Messrs. Brock, Kelly, McKay and O'Callaghan.

On April 1st, 1875, $50 was loaned to a laborer named Daniel Leahy upon his note, payable in three months. On May 5th, 1876, Leahy paid $20 on account of his indebtedness. Nothing more has been or can be collected. The loss in case of this loan

·must be borne by the defendants Bevans, Brock, Carroll, Dittmar, Halliard, Keary, Kelly, McBride, McKay, Meehan, Miller, Monks, McDonald, O'Callaghan, Murphy, Reilly, Sweeney, Smyth and Sheeran.

On August 21st, 1875, David Walsh borrowed· $50 on his note, payable in one week. On September 29th, 1875, he paid $35 on account of his indebtedness. The balance remaining unpaid, with interest, is lost. Recovery for it must be had from the defendants last named, and the defendant Donelan, who became a manager in May of 1875.

The note of J. W. Van Houten, $44.95, was given for an over-draft. It was not a loan. It does not appear that the over-draft was not an accident incident to the business of banking. I fail to perceive upon what principle any of the defendants should be held liable for it.

On September 30th, 1876, Patrick F. Lee borrowed from the bank $65 upon his note. On October 19th, 1876, he paid $40 on account of his indebtedness. The balance, $25, was never paid, and cannot be recovered. The loss must fall upon the defendants last named.

On April 17th, 1876, John Halliard borrowed $500 from the bank upon his note. The note was regularly approved by the finance committee. The loss must fall, first, upon the defendant John Halliard, and then upon the other defendants last mentioned.

On February 6th, 1877, the defendant Adam J. Dittmar borrowed $200 from the bank upon his note. Dittmar became bankrupt, and this money was lost. The defendants liable are, first, the defendant Dittmar, and then the other defendants who were last enumerated, and the defendant Reid.

On March 12th, 1877, $125 was loaned to Ellen Flannagan upon her note, endorsed by Rev. M. J. Brennan. The receiver sued upon this note and obtained a judgment, which has been partially paid by the endorser. This partial payment was purely voluntary. Nothing can be recovered by process of law. An account must be taken of the amount still unpaid, and the defendants last named held responsible for it.

The same defendants are responsible for the loss of $160 loaned to S. E. Allen upon his note, dated February 9th, 1878, and for $210 loaned to Charles M. Prior upon his note, dated March 14th, 1878. The note of Prior was for $250, but was reduced to $210 by the payment of $40 on account of it.

The defendant John Halliard also appears to have openly taken money from the bank without security.

I have already referred to the note he took up when the Neely mortgages were given to the bank. Those mortgages, as have been seen, were inadequate security, and were not submitted to the finance committee for its approval. Halliard put them upon the bank, and then took his note for $4,000 from the bank. The note thus taken was dated March 3d, 1875, and was payable upon demand. It does not appear that it was ever approved by the finance committee, though it was regularly entered upon the books of the bank. It appears that the $4,000 were drawn by check signed by Halliard and Reilly, made payable to Halliard's order. Although this transaction appears to be a loan, I do not think it can fairly be classed as such. Halliard had it in his power, because of the loose practices of the treasurer, Reilly, and the secretary, Hallanan, and the supine indifference of committeemen and managers, to withdraw whatever funds he pleased from the bank. The check used to obtain this $4,000 was probably one that Reilly had signed in blank. The books and papers of the bank were in the immediate custody and control of the defendant Donelan, who was subservient to Halliard's will, although he must have been aware of Halliard's dishonesty. Without the knowledge of any one but Donelan, this $4,000 could easily have been withdrawn and the demand note given. It can hardly be claimed that such a transaction was a loan. The subsequent attempt to substitute a worthless mortgage for it, lends color to the belief that Halliard desired to conceal the transaction, and that the note did not represent a loan. It is manifest that for this $4,000 and interest the defendant Reilly is secondarily liable. The executive committee then in office, to whom Reilly's methods and Halliard's unrestricted control of the bank should have been known, were Carroll, Keary and Meehan, and

they are next in order of liability. The whole body of man-
agers, being charged with a general circumspection, should also
have known Reilly's methods, Halliard's control, and their ex-
ecutive committee's neglect, which were pronounced, long-con-
tinued and easily detected, and they are, therefore, next liable.
In addition to Halliard, Reilly, Carroll, Dittmar and Sweeney,
the managers then were Bevans, Brock, Keary, Kelly, McBride,
McKay, Meehan, Miller, Monks, Murphy, McDonald, O'Calla-
ghan, Smyth and Sheeran.

In the same situation with the note just mentioned stands a
bond of John Halliard to the bank for $2,000, dated in Oc-
tober, 1872, representing money had by check dated in De-
cember, 1871, and a similar bond for $5,000, dated October 1st,
1872. These bonds were made to account for moneys that had
been taken by Halliard by means of checks signed by the treas-
urer, Reilly. No mortgages accompanied the bonds. Halliard
is first liable for the loss; then Reilly is liable, because his neg-
ligence permitted the money to be taken from the treasury; then
the defendants Fitzpatrick, Perveil and Sheeran, who composed
the executive committee, and were specially charged with the
duty of examining the books and securities, and then the general
body of managers, who were charged with the general super-
vision of the bank. The managers then in office were Bevans,
Carroll, Dittmar, Fitzpatrick, Farrelly, Halliard, Keary, Mc-
Bride, McGuigan, Meehan, Miller, Monks, Perveil, Reilly,
Sweeney, Smyth and Sheeran, and also Murphy (so far only as
the $5,000 note is concerned).

On the 14th of October, 1874, the defendant Halliard with-
drew from the bank $700, leaving in its place his individual
check, payable to the order of the defendant Donelan, who was
then assistant secretary and not a manager, and on November
the 2d, in the same year, withdrew the further sum of $2,241.11,
leaving in its place his individual check for the same amount,
payable to the order of the savings bank. On the same date he
also took the further sum of $321.77, leaving in its place his
demand note for the same amount. Mr. Donelan cannot or does
not state how these moneys were withdrawn. He thinks that

the $700 was had by check signed by the treasurer, Reilly, but there is no certainty in his testimony in this respect. The two checks were carried as cash, never being presented for payment, while the note was placed among the bills receivable. I cannot hold Reilly liable for this $700 because of his negligent practice of signing checks in blank. It is not made to appear that the money was obtained in that way. The negligent surrender of the bank into the hands of Messrs. Halliard and Hallanan made this loss possible. The defendants Carroll, Keary and Meehan were upon the executive committee at the times of these withdrawals, and, after Halliard, should be held primarily responsible, and the defendants Bevans, Brock, Dittmar, Kelly, McBride, McKay, Miller, Monks, Murphy, McDonald, O'Callaghan, Reilly, Sweeney, Smyth and Sheeran were managers, and should be held secondarily liable.

The complainant further seeks to charge the defendants with the loss of other moneys that were *secretly* withdrawn from the bank.

The exact amounts so withdrawn cannot be ascertained, but the false entries in the books, hereafter referred to, with reasonable certainty establish that the withdrawals amounted to at least the sums covered by those entries, and were made before the dates of the entries.

Three of these entries, made on the 31st of October, 1871, represent that three mortgages were invested in, one for $2,400, purporting to have been made by P. McNulty; one for $2,000, purporting to have been made by John C. Socei, and one for $1,800, purporting to have been made by John K. Van Arsdale. Another such entry, made on December 12th of the same year, represents that an investment of $2,100 was made on a mortgage purporting to have been given by one Spencer M. Rice, and, about the same time, another similar entry represents a further investment in a mortgage purporting to have been made by one M. McCarty, for $4,000. On October 31st, 1872, still another false entry represents the investment of $20,000 in United States bonds. It is clearly established that there were no such investments of the bank's funds, and that the entries

were made by the secretary, Hallanan, with the knowledge of the defendant Halliard, to conceal the fact that moneys had been abstracted.

The McCarty and McNulty entries, according to the testimony, were made to account for moneys that the secretary, Hallanan, had taken, and the remainder of the entries to cover withdrawals by Halliard. At a reckoning between Halliard and the executive committee of the bank, after the death of Hallanan, Halliard recognized his liability for all the sums represented by these entries, in addition to other moneys then charged against him.

The entries indicate that, prior to the end of 1871, $12,300 of the bank's moneys had been thus taken, and that by the end of October, 1872, an additional $20,000 had been unlawfully withdrawn. The proofs show, also, that, notwithstanding these fictitious credits, the books exhibited a cash balance in excess of the actual cash. It was not until after Mr. Donelan had become a manager, in 1875, that the fictions and shortage in cash, above spoken of, with other irregularities, were discovered. As he then ceased to be a subordinate, he reconciled it with his conscience to disclose to a few of his fellow-managers his knowledge of the condition of the bank. Efforts were then made to recover the moneys that had been abstracted, with but little success. The great fall in values of real estate had so embarrassed Mr. Halliard that he was unable to respond to the demands made upon him, notwithstanding the fact that between the year 1869 and the year 1873 he estimated his estate to be worth $100,000. He, however, promised full payment, and the managers, to whom his conduct had been disclosed, agreed that the situation should be kept secret, and an opportunity given him to make good his promises. Under this arrangement he was kept at the head of the institution until just before it closed its doors, in 1878.

It is impossible to say how this money was abstracted. Mr. Halliard's admissions do not go so far as to disclose his methods. Hallanan, the secretary, was undoubtedly party to the wrong-doing. All deposits received by the bank and all moneys paid

by depositors passed through his hands, and withdrawals may have been had from such moneys as well as from the funds in the bank's depository, which were subject to the treasurer's check. It then follows, that Mr. Reilly cannot, with certainty, be charged with this loss because he negligently signed checks in blank.

There can be little question that his negligence afforded opportunity for withdrawals, but, under the proofs, it cannot be said that those opportunities were, in this connection, taken advantage of.

It is impossible to determine how the moneys were taken, but that they were taken is not denied.

When the relations of the executive committeemen to the bank are considered, it becomes apparent that, if they had faithfully and had carefully performed their duties, these withdrawals would have been prevented. The by-laws specially bound them to examine the books of the bank. Although this was a duty expressly enjoined upon them, and they assumed its performance, I do not understand that it required their examination to be as accurate as that which might have been expected of an expert accountant; but I think that they should have carried it far enough to understand the method of book-keeping that prevailed, and to have been able to detect the glaring difference between the actual cash and the cash called for by the books. I cannot conceive that a man of ordinary prudence, prompted by self-interest, would not have brought to bear that much care and skill in the management of his own affairs. The failure in a timely performance of this duty made the withdrawals possible, and enabled the officers of the bank to conceal their misdeeds until they became so financially embarrassed as to be unable to return the money they had taken.

After the fictitious mortgages had been listed as securities, it seems to have been even more inexcusable that the wrong-doing was not discovered. From April, 1872, till late in 1875, lists containing the names and amounts of these fictitious mortgages were repeatedly examined by the executive committeemen, and approved. This very fact illustrates the careless and perfunctory

manner in which they performed their duties, for the fictitious mortgages, which they approved of as proper securities for a savings bank, did not in fact exist.

The position of the finance committeemen is little better than that of the executive committeemen. They were present when the lists containing the names of these pretended mortgages were laid before the managers. In them they saw that $12,300 had been invested without their approval. If they had not been utterly indifferent to their office and their prerogatives, such an indignity would have prompted them to demand an explanation, or at least would have put them upon inquiry as to the character and value of the investments.

The managers who were not upon committees were bound to a reasonable supervision of the committees. Chief-Justice Beasley says that that duty was so plain, that they are chargeable *prima facie* with knowledge of all the important acts of the committees. If they were chargeable with knowledge of acts, by parity of reasoning they should also be chargeable with knowledge of omissions or non-performance of duty.

It is true, they deny knowledge of the derelictions of their committeemen, but in face of proofs that clearly show that the bank was notoriously operated by Halliard and Hallanan, in utter disregard of the committees, this denial serves only to prove them to have been guilty of gross negligence.

Their professions of confidence in Halliard will not protect them. The duty required of them was the care that an ordinarily prudent man exercises in a similar business of his own, not a blind, unsuspicious confidence in their president.

The circumstance that that officer habitually disregarded and violated the charter and by-laws of the bank, should have been sufficient to have destroyed such a confidence.

Had these committeemen and managers performed their duties with ordinary care, I am satisfied that these withdrawals might have been prevented.

The false charge of $20,000 expended in United States bonds was made more than a year after the entry of the fictitious mortgages, and then in such a clumsy manner as to patently exhibit

that the books had been tampered with. This entry shows, that, encouraged by the successful covering of previous withdrawals by fictitious mortgages, other moneys were taken, and another artifice was resorted to in order to conceal their withdrawal.

It has already appeared that Mr. Halliard pretended to pay the interest on these bonds by allowing a credit upon the worth-less Neely mortgages. These bonds were listed among the securities of the bank more than two years before it was discovered that they did not in fact exist. It is quite apparent, that the detection of the withdrawals covered by the fictitious mortgages would have effectually prevented the subsequent withdrawals represented by these pretended bonds.

It is apparent that the charter contemplated that the officers of the bank should give security for their fidelity and good conduct. The failure to require such security of the president was undoubtedly an omission of duty on the part of the managers. If such bond had been given, without question the bank's losses would, in a measure, have been provided for. The non-exaction of the bond is another proof of the general neglect and indifference that prevailed in the management of the institution.

It is difficult to determine for how much of the loss occasioned by these withdrawals the several defendants should be held liable. The defendants Bevans, Carroll, Fitzpatrick, Halliard, Keary, McBride, McGuigan, Meehan, Perveil, Reilly and Shee-ran were managers during the entire time of the withdrawals, and I think they should be held responsible for all of them. Messrs. Dittmar, Miller, Smyth, Farrelly, Monks and Sweeney were regularly elected directors in May, 1871, but I cannot say, as to them, that they should be held responsible for any part of the withdrawals, because the exact time of those withdrawals does not appear. I am satisfied merely of the fact that they were had between the organization of the bank, in 1869, and the entry of the fictitious mortgages, in 1871 and 1872. It is impossible to say, with certainty, that they were made after May, 1871.

I think that, upon principle, the executive committeemen during this period, after the defendant Halliard, should be held

primarily liable for these losses, but they changed so often during the time covered by the withdrawals that I find it to be utterly impossible to apportion the losses among them.